In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1931

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AMEN E. JUMAH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:04-cr-00237-1—**John W. Darrah,** *Judge.*

ARGUED OCTOBER 7, 2009—DECIDED APRIL 1, 2010

Before RIPPLE, KANNE and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Amen E. Jumah was convicted by
a jury of knowing possession of a listed chemical, knowing,
or having reasonable cause to believe, that the chemical
would be used to manufacture a controlled substance
in violation of 21 U.S.C. § 841(c)(2). The district court,
acting without the benefit of the Supreme Court's subse-
quent decision in *Dixon v. United States*, 548 U.S. 1 (2006),
granted a motion for a new trial on the ground that the

jury had been instructed erroneously about the public authority defense. We reversed the district court's grant of Mr. Jumah's motion for new trial and remanded the case with instructions to reinstate the jury's verdict. *See United States v. Jumah*, 493 F.3d 868, 870 (7th Cir. 2007) ("*Jumah I*"). On remand, the district court considered Mr. Jumah's remaining grounds for a new trial. One of those arguments was that the Government had failed to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The district court denied the motion for new trial and sentenced Mr. Jumah to 151 months' imprisonment. For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the district court and remand with instructions for re-sentencing.

# I

# BACKGROUND

## A.

From 2001 to 2002, Mr. Jumah worked periodically as a confidential source ("CS") for the Drug Enforcement Administration ("DEA"). He assisted with undercover investigations into pseudoephedrine trafficking in Chicago and Los Angeles. Mr. Jumah sometimes provided information about past pseudoephedrine transactions. However, Mr. Jumah usually brought to the DEA information about a deal that was to occur in the future.

The DEA asked Mr. Jumah to sign a United States Department of Justice confidential source agreement.

Under its terms, the DEA authorized him to purchase, while undercover and at the direction of the DEA, controlled substances. The agreement also required Mr. Jumah to abide by the instructions of his controlling DEA investigators and not to take any independent action on behalf of the DEA. Mr. Jumah signed three such agreements in 2001 and 2002.

On May 8, 2002, while Mr. Jumah was deactivated as a CS, he contacted a DEA agent and informed him that a pseudoephedrine dealer had approached him with an offer to buy 300 cases of pseudoephedrine for $150,000. DEA agents instructed Mr. Jumah to meet with the dealer at a restaurant called Jimmy's Shishkabob to discuss the deal. While the DEA surveilled the meeting, Mr. Jumah offered to consummate the deal at another location, and the dealer showed that he had the necessary funds to do so. When Mr. Jumah and the dealer left the Jimmy's Shishkabob restaurant, the DEA stopped the car carrying the money and arrested the suspects. The DEA paid Mr. Jumah $29,800 for the information and assistance he provided. The DEA formally reactivated him as a CS several days later.

In February 2004, Mr. Jumah attempted to sell Ali Qasem pseudoephedrine for the purpose of making methamphetamine. Unknown to Mr. Jumah, Qasem was himself a CS who worked with the Los Angeles, California branch of the DEA. According to Qasem, Mr. Jumah initiated the deal. On February 10, 2004, while Qasem was en route to Chicago for a meeting with Mr. Jumah, Mr. Jumah contacted a DEA agent and inquired about

receiving payment for prior information, unrelated to the developing Qasem deal, that Mr. Jumah had provided. Mr. Jumah did not inform the agent of the pending deal with Qasem.

Working with Qasem, the DEA listened to telephone conversations between Mr. Jumah and Qasem and surveilled meetings between them in Illinois from February 13 to 16, 2004. During these conversations, Mr. Jumah told Qasem that he wanted to conduct the pseudoephedrine transaction on a Sunday or Monday because the DEA agents would not be working on those days. On February 16, the day that Mr. Jumah planned to meet Qasem, Mr. Jumah called a DEA agent and asked whether the agent was working that day but said nothing about the pending deal with Qasem. The DEA surveilled additional meetings between Mr. Jumah and Qasem in Illinois on March 1 and 2, 2004. On March 2, Mr. Jumah called a DEA agent, asked whether the agent was working that day and said that he was going to meet with an individual, but gave no details about the identity of the individual or the purpose of the meeting. The DEA agent did not inquire further about the matter. Later that day, Mr. Jumah again called the DEA agent and left a voicemail message stating, "he called me back, and he is going to be in town, in Chicago tonight . . . . And I'll let you know what's going on . . . if we have to set up something for tomorrow or Thursday, uh, we'll see what's going on." Tr. at 232, 234, Jan. 26, 2006. Mr. Jumah also stated on the voicemail message, "I am going to meet him and see and see [sic] what's going on, if he's, uh, got the cash or not." *Id.* at 235.

Mr. Jumah met with Qasem later that day, but Mr. Jumah did not inform the DEA agent that the meeting actually had occurred. During that meeting, Mr. Jumah gave Qasem 1,016 pills containing pseudoephedrine. Qasem promptly turned the pseudoephedrine over to the DEA, which had been conducting surveillance. The DEA then directed Qasem to place a larger order of pseudoephedrine with Mr. Jumah. Mr. Jumah agreed to sell 300 boxes of pseudoephedrine to Qasem for $165,000 later that night.

At approximately 8:00 p.m. on March 2, 2004, Mr. Jumah and Qasem met at a casino in Joliet, Illinois, to complete the deal. The DEA observed the meeting and watched Mr. Jumah leave the casino to pick up the pseudoephedrine. When Mr. Jumah returned, purportedly with the pseudoephedrine, the DEA arrested him and searched his vehicle. Inside, the DEA found rock salt that was similar in quantity and appearance to the pseudoephedrine Mr. Jumah had agreed to provide Qasem.

Upon his arrest, Mr. Jumah waived his *Miranda* rights and made a series of incriminating statements. He first stated that one of the DEA agents with whom Mr. Jumah had spoken that day had authorized him to conduct the Qasem transaction. He further stated that the DEA agent had given him the pseudoephedrine. Later, Mr. Jumah retracted that statement and said that he had stolen the pseudoephedrine from the DEA several months earlier.

## B.

On March 11, 2004, a federal grand jury returned a one-count indictment against Mr. Jumah charging him with

knowingly and intentionally possessing and distrib-
uting 1,016 tablets of pseudoephedrine, a List I chemical,
knowing and having reason to believe that the pseudo-
ephedrine would be used to make methamphetamine,
in violation of 21 U.S.C. § 841(c)(2).

On April 19, 2004, Mr. Jumah filed a motion for discov-
ery. The Government provided some discovery pursuant
to Federal Rule of Criminal Procedure 16. Over the next
year and a half, the trial date was continued several times
until it was scheduled finally to begin on January 23, 2006.
On November 8, 2005, Mr. Jumah substituted counsel;
the district court denied the new counsel's request for
an additional continuance.

Mr. Jumah's newly substituted counsel then began
issuing trial subpoenas to DEA agents.[1] On January 9,

---

[1] Specifically, on December 8, 2005, Mr. Jumah issued two trial
subpoenas to the DEA Keeper of Records. The first subpoena
requested: (1) all names of DEA agents who had contact
with Mr. Jumah; (2) the dates of those contacts; and (3) items
memorializing those contacts. The second subpoena requested:
(1) all documents related to Mr. Jumah; (2) all documents
related to Qasem becoming a CS for the DEA; (3) payments
made to Qasem by the DEA; and (4) Qasem's criminal history.

On December 27, 2005, Mr. Jumah issued four trial subpoenas
to California DEA agents Bradley Clemmer, Ted Salamy, Efren
Lapuz and George Newland. The subpoena to Bradley Clemmer
sought: (1) the substance of Agent Clemmer's testimony at trial;
and (2) all documents memorializing his contacts with
Mr. Jumah, including the dates, times, duration, and nature

(continued...)

2006, Mr. Jumah's counsel also filed a motion for immediate disclosure of favorable evidence, requesting that the Government turn over all *Brady* and *Giglio* evidence.

On January 11, 2006, the Government filed a motion to quash the subpoenas on the ground that the requested documents were not required to be disclosed by the

---

[1] (...continued)

of the contacts, as well as Mr. Jumah's duties. The subpoena to Ted Salamy sought: (1) the substance of Agent Salamy's testimony at trial; (2) all documents memorializing his contacts with Qasem; (3) any statements made by Qasem about his criminal past; (4) all documents memorializing when Qasem became a CS for the DEA; (5) all agreements with Qasem and confidential-source-establishment documents; and (6) payments to Qasem. The subpoena to Efren Lapuz sought: (1) the substance of Agent Lapuz's testimony at trial; (2) all documents memorializing his contacts with Qasem; and (3) all documents relating to payments made to Qasem by DEA in the investigation of Mr. Jumah. The subpoena to George Newland sought: (1) all documents memorializing his contacts with Qasem relating to the Jumah investigation; and (2) all payments made to Qasem by DEA in the Jumah investigation.

On January 6, 2006, Mr. Jumah issued another trial subpoena to FBI Agent John Diwik. The subpoena to Agent Diwik sought Agent Diwik's testimony at trial regarding: (1) the first date Mr. Jumah acted as a CS for the FBI; (2) the number of investigations Mr. Jumah worked on; (3) how much Mr. Jumah was paid for his work; (4) the method, manner and times Agent Diwik communicated with Mr. Jumah; and (5) a list of agencies that Mr. Jumah worked for at the direction of or on the recommendation of Agent Diwik.

discovery rules, were irrelevant to the case or lacked evidentiary value. R.68. The Government also stated that it had met its obligations under *Brady* but that its review for the *Giglio* material was still ongoing. Specifically, the Government stated,

> Jumah was a DEA [CS] in Chicago and Los An- geles, California and an FBI [CS] in Chicago, and Qasem was a [CS] in Riverside, California; San Diego, California; and Chicago, Illinois. The gov- ernment has produced all *Giglio* materials con- tained in Jumah's and Qasem's DEA [CS] files in Chicago and will produce by January 12, 2006 all *Giglio* materials contained in Jumah's FBI [CS] file. The [CS] files in Los Angeles, Riverside, and San Diego, however, have not been fully reviewed. These files cannot be sent to Chicago and, there- fore, must be reviewed by attorneys in those cities. The government is working diligently to get this review completed, but it has not at this time been done.

R.68 at 7. The Government also requested, with Mr. Jumah's consent, that trial be continued to allow completion of the Government's *Giglio* search.

The next day, on January 12, 2006, the district court held a hearing to consider these issues. The district court denied the requested continuance. The district court stated, "I'm amenable to anything that needs my cooperation to see that this favorable evidence, if in fact that's what it is, is produced, but we are going to trial on this case on January 23rd." Tr. at 4, Jan. 12, 2006.

At the hearing, the Government assured the district court that it had produced all materials it was obligated to produce pursuant to Rule 16, 18 U.S.C. § 3500 and *Brady*. *See* Tr. at 7-8, Jan. 12, 2006. However, the Government reiterated that it needed more time to complete its *Giglio* search and production. Specifically, it stated,

> The [CS] files in Chicago, both Mr. Juma's [sic] file with the FBI and Mr. Jumah [sic] and Mr. Qasem's file with the DEA have been reviewed and all *Giglio* materials that were within those files have been turned over to the defense. With regard to the files in California, a DEA attorney in California is reviewing, is going to each of those cities and is reviewing those files. That is currently being undertaken.

*Id.* at 8-9. The district court held that the Government had complied with its *Brady* obligations and directed the Government to complete its search for any *Giglio* responsive documents in its California offices by the following Tuesday. *Id.* at 12.

The district court then took up the Government's motion to quash the subpoenas. Mr. Jumah maintained that he was entitled to the entire file that the DEA kept concerning him and Qasem, including all records of all statements made by Mr. Jumah and Qasem related to prior investigations in which they had participated. Mr. Jumah maintained that those materials would be probative on the issue of his state of mind during the February 2004 incident and his course of conduct as a DEA CS. Mr. Jumah also suggested that he needed to

review the files to disprove the DEA's position that it never had provided samples of pseudoephedrine to Mr. Jumah for his work in any investigation. The Government opposed the request and maintained that Mr. Jumah was not entitled to materials beyond those that qualified as Rule 16, § 3500, *Brady* or *Giglio* materials and reiterated that this material already had been produced for the most part. The Government also stated that no documents existed concerning the distribution of pseudoephedrine samples to Mr. Jumah because the DEA in Chicago had confirmed that such distribution never had occurred.

The district court granted the motion to quash all the trial subpoenas, except the subpoena of Agent DeWitt because Mr. Jumah intended to call him at trial. Tr. at 23-24, Jan. 12, 2006. As to the other subpoenas, the district court stated that Mr. Jumah was merely seeking materials "derivative from *Brady* and *Giglio*" materials that the Government already had produced or was in the process of identifying and producing. *Id.* at 11. The district court stated that Mr. Jumah was not entitled to "every piece of minutia in the conduct of government agents and people working for them in the course of an investigation." *Id.* at 19-20. However, the district court directed that the Government contact anyone Mr. Jumah had worked for as an informant, including the Chicago and California DEA offices, to inquire, again, about the existence of any documents showing that the DEA had provided Mr. Jumah with pseudoephedrine samples. *Id.* at 17-18. Finally, the district court noted that Mr. Jumah

had to "rely on the bonafides of the government" with respect to its representations about the existence of any remaining *Brady* and *Giglio* material. *Id.* at 16-17.

On January 17, 2006, the Government apparently sent Mr. Jumah a letter confirming that it had completed its search for *Giglio* materials in the California DEA offices and found none. *See* Appellee's Br. 17. That letter was not made part of the record.

At a pre-trial conference on January 18, 2006, the Government again brought up the subpoenas issue and the district court foreclosed further discussion of the matter. The following colloquy occurred:

> [THE GOVERNMENT]: As the court pointed out at the last hearing, with regard to the defense's subpoenas, the information that was requested in those subpoenas, as the government understood it from the court's ruling, was determined to be irrelevant because in fact whether Mr. Jumah—
>
> THE COURT: Let me say this, that the basis of my ruling is what I said in the courtroom last week, and both of you have taken a little bit of liberty in characterizing to your advantage what you believe would be, I think, a little extrapolation of what I said. So what I said I said, and that's on the record last week, and those are the reasons for my ruling.

*See* Tr. at 14, Jan. 18, 2006. Later in that hearing, the Government reminded the district court that it had directed the Government to inquire specifically into whether any

federal agency had ever provided Mr. Jumah with pseudoephedrine samples. The Government represented that its review of Mr. Jumah's files in Chicago and Los Angeles produced no documents showing that Mr. Jumah ever had been provided with pseudoephedrine samples. *Id.* at 20.

On or around January 20, 2006, during an interview with Qasem, the Government learned for the first time that Qasem had conducted two pseudoephedrine deals with Mr. Jumah in 2001. The Government considered that information to be *Giglio* material and disclosed it to Mr. Jumah by fax on January 21, 2006. *See* Appellee's Br. 17; R.107 at 13. Also, on January 20, 2006, the Government filed a motion in limine to permit the admission at trial of evidence and arguments concerning those drug deals—*i.e.*, Jumah's prior uncharged criminal acts—as inextricably intertwined with the charged offense. R.87. The district court conditionally precluded the evidence without prejudice to renewal of the motion at trial. R.136-2; *see also* Appellee's Br. 18.

Trial was held, beginning one day early, on January 25, 2006. At trial, the Government introduced testimony from Chicago DEA agents that Mr. Jumah was not an active CS at the time of the deal with Qasem and that Mr. Jumah had acted independently and without authority from the DEA to possess and sell pseudoephedrine. DEA agents testified about prior sting operations in which Mr. Jumah had participated, including the Jimmy's Shishkabob incident. The DEA agents explained that under no circumstances would Mr. Jumah have been

allowed to sell pseudoephedrine without the DEA's knowledge and then benefit from information provided therefrom. The DEA agents also described the events that occurred on and leading up to March 2, 2004. Qasem testified as a Government witness about the March 2004 events and stated that he had known Mr. Jumah for approximately fourteen years. *See* Trial Tr. at 312, Jan. 26, 2006. On cross-examination of Qasem, Mr. Jumah's counsel did not explore their prior relationship in any detail.[2]

Mr. Jumah's defense was that he reasonably believed he had authority to enter into the pseudoephedrine deal with Qasem. Mr. Jumah read stipulations into evidence showing that he was employed as a DEA CS from time-to-time, that Mr. Jumah made several phone calls to the DEA agents on and around March 1-2, 2004, and that Mr. Jumah knew that Qasem was traveling to Illinois in

---

[2] On cross-examination of Qasem, defense counsel began asking about Qasem's prior relationship with Mr. Jumah and how long the two men had known each other. Trial Tr. at 414, Jan. 27, 2006. The attorney for the Government objected and stated, "I just want to notify the court that if [defense counsel is] going to go into the fact that [Qasem] doesn't trust [Mr. Jumah] and why he doesn't trust [Mr. Jumah], that's what I intend on asking on cross examination [sic], and I believe she's opened the door at this point." *Id.* at 415. The district court overruled the objection. *Id.* However, defense counsel moved on to another line of questioning and did not ask Qasem additional questions about his prior relationship with Mr. Jumah.

February 2004. Mr. Jumah did not testify at trial. Nor did he introduce evidence showing that the Government provided him with pseudoephedrine samples. Neither party offered evidence showing that Mr. Jumah and Qasem previously had conducted drug deals with each other.

On January 27, 2006, the jury convicted Mr. Jumah on the one count of distributing 1,016 pills containing pseudoephedrine. As we have noted earlier, the district court granted a new trial because it believed that the jury had been instructed erroneously on the public authority defense. We reversed that ruling, *see Jumah I*, 493 F.3d at 878-79, and, on remand, the district court proceeded to consider Mr. Jumah's other proffered grounds for a new trial. Among them was the contention that the Government had failed to disclose documents pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 153 (1972). *See* R.101. On January 29, 2008, the district court denied the motion, ruling that Mr. Jumah failed to show that the Government had withheld any evidence that qualified as *Brady* or *Giglio* material. *See* R.178 at 4.

On April 9, 2008, the district court sentenced Mr. Jumah to 151 months' imprisonment. *See* Tr. at 23, Apr. 9, 2008; R.183. The district court calculated the Guidelines according to the gross weight of the pseudoephedrine pills, instead of the weight of the pure drugs contained therein. No party objected to the district court's calculations, which were in accordance with the Presentence

Investigation Report ("PSR") calculations. On April 16, 2008, Mr. Jumah timely appealed.

## II

### DISCUSSION

#### A.

We first consider Mr. Jumah's claim that his right to due process of law as guaranteed by the Fifth Amendment was violated by the Government's withholding of evidence. We review a district court's decision that evidence need not be produced under *Brady* or *Giglio* for an abuse of discretion. *See United States v. Olofson*, 563 F.3d 652, 661 (7th Cir. 2009).

Mr. Jumah primarily contends that the Government conducted an inadequate search for *Brady* and *Giglio* material in its possession, both in Illinois and in California. Mr. Jumah maintains that he was entitled to receive his complete CS file from the DEA and FBI. He also contends that he was entitled to receive Qasem's complete CS file and the DEA's debriefings of Qasem in connection with the investigation of Mr. Jumah. Appellant's Br. 22, 29. Mr. Jumah believes that the CS files would have shown that the DEA provided him with pseudoephedrine samples in the past. He also states that the CS files would have supported his theory that, even when he was deactivated, he routinely would obtain information regarding possible criminal conduct and bring it to the attention of the DEA agents "after it ripened into a possible sting." *See id.* at 22. He believes that the CS files would show that, prior to 2004, Mr. Jumah had

participated in investigations into Qasem's narcotics dealings and that "Qasem was a long-standing target of Jumah's work as a CS." *Id.* at 22-23, 29.[3]

Mr. Jumah contends that the Government cannot avoid its duties by asserting that relevant materials are not in its possession. *Id.* at 27 (citing *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999)). He further contends that "[w]here evidence is in the exclusive control of the government or has been destroyed by the government, a defendant may establish that the government suppressed exculpatory evidence without specifically identifying the allegedly suppressed evidence, if the defendant makes some showing that evidence was suppressed." *Id.* at 28 (citing *United States v. Driver*, 798 F.2d 248, 251 n.1 (7th Cir. 1986)). Mr. Jumah notes that in *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987), "the Supreme Court held that a defendant, charged with the rape and incest of his daughter, was entitled to have the state's Children and Youth Services file on his daughter reviewed by the trial court to determine whether it contained *Brady* infor-

---

[3] Mr. Jumah also intimates that the district court committed reversible error by denying the Government's motion for a continuance. *See* Appellant's Br. 27. However this argument is not pursued seriously in Mr. Jumah's briefing; thus, we treat it as waived. Also, at oral arguments, Mr. Jumah maintained that the district court erred by limiting the scope of the Government's search of its California files. We consider that argument to be part and parcel of Mr. Jumah's argument that his right to due process of law was violated by the Government's failure to turn over all *Brady* and *Giglio* responsive materials.

mation." Appellant's Br. 30 (describing *Ritchie*). Finally, Mr. Jumah contends that he particularly deserved to receive Qasem's file and the DEA's debriefings of Qasem because Qasem provided unverified testimony about what was said in the conversations between Mr. Jumah and Qasem. *Id.* at 32 (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)).

The Government reiterates that it completed its review of Mr. Jumah's and Qasem's CS files, including the California files, by January 17, 2006, and found no *Brady* or *Giglio* material other than what it turned over. Appellee's Br. 19. The Government maintains that Mr. Jumah now speculates that additional responsive documents exist in the CS files. Although the Government denies that such documents exist, it further maintains that Mr. Jumah "is not entitled to scour government files in the hopes of finding *Brady/Giglio* material." *Id.* (citing *United States v. Phillips*, 854 F.2d 273, 277 (7th Cir. 1988)). The Government concedes that an *in camera* inspection of Government files is sometimes appropriate, but notes that Mr. Jumah never asked for an *in camera* inspection of the records in this case. *Id.* at 20-21. Finally, in response to Mr. Jumah's argument with respect to specific documents, the Government asserts that: (1) it never gave pseudo-ephedrine samples to Mr. Jumah and did not withhold any documents showing otherwise, *id.* at 21, 26; (2) its files do not contain any documents showing that Mr. Jumah and Qasem had engaged in two previous pseudo-ephedrine deals, particularly because the Government learned of those deals from Qasem only on the eve of trial and alerted Mr. Jumah accordingly, *id.* at 23; and (3) it

"gave the defendant all documents related to Qasem's participation in the investigation of the defendant," including documents titled "debriefings" and those titled "case status reports," *id.* at 24.

In *Brady*, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process of law where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." The Supreme Court further held in *Giglio*, 405 U.S. at 153, that any material evidence which might undermine the reliability of a government witness must be turned over to a defendant. In other words, a new trial is required if the evidence at issue is (1) favorable, (2) suppressed and (3) material to the defense. *See United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J., concurring); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (discussing the *Bagley* standard). "Reasonable probability" does not mean something greater than 50% but rather "whether in . . . [the] absence [of the evidence, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The defendant has the burden to establish that a *Brady* or *Giglio* violation occurred. *See Wilson*, 237 F.3d at 832. However, prosecutors "have an affirmative duty to dis-

close such evidence and a duty to 'learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) (quoting *Kyles*, 514 U.S. at 432). Thus, while "[p]rosecutors may not simply claim ignorance of *Brady* material," *id.* at 996, a defendant cannot demand a new trial based on "mere speculation" or "unsupported assertion[s] that the government suppressed evidence," *United States v. Driver*, 798 F.2d 248, 251 (7th Cir. 1986).

In light of this standard, we cannot agree with Mr. Jumah that the Government conducted an inadequate search for responsive *Brady* or *Giglio* material. As an initial matter, Mr. Jumah was not entitled to receive his entire CS file or government files concerning Qasem. *See United States v. Philips*, 854 F.2d 273, 278 (7th Cir. 1988) ("[W]e hasten to point out that *Brady* does not grant criminal defendants unfettered access to government files.").[4] Rather, he was entitled to receive any documents materially favorable to him or which might undermine the reliability of witnesses.

The Government conducted a sufficient search of its files for documents falling into that category. As of the pretrial hearing on January 12, 2006, the Government represented that it had produced all *Brady* material in its possession. The district court accepted the Government's

---

[4] At least with respect to documents concerning Qasem's participation in the investigation into Mr. Jumah, the Government claims that it actually produced its entire file. *See* Appellee's Br. 24-25.

representation and reminded Mr. Jumah that, without allegations of specific pieces of evidence that had been withheld, he had to rely on "the bonafides of the government." *See* Tr. at 16-17, Jan. 12, 2006. At that hearing, however, the Government indicated that it still needed to complete a review of its California files for *Giglio* material, and the district court urged the Government to expedite the search.

Then, at the January 18 conference, the Government assured the district court that it had completed its review of the California files and had found no responsive documents. The record is clear that the Government completed its search of the California files. The Government referred to its search of the California files for documents specifically related to past instances of distribution of pseudoephedrine to Mr. Jumah and informed the district court that it had found none. Moreover, the record cannot be fairly read as reflecting that the Government, in searching for this information in its files, was oblivious to its broader duty to disclose any other exculpatory or impeachment material. Indeed, throughout its filings before the district court and this court, the Government has maintained that it conducted a thorough search of all its files in all offices for *Brady* and *Giglio* material and withheld nothing.[5]

---

[5] We have no need to consider the Government's contention, made in its brief apparently for the first time, that it sent Mr. Jumah a letter confirming that it had completed its search for *Giglio* materials in the California DEA files on January 17,

(continued...)

If Mr. Jumah believed that he needed access to his and Qasem's entire DEA files, he could have requested that the district court undertake a review *in camera* of the Government's files. *Cf. Ritchie*, 480 U.S. at 58 n.15 (explaining that to obtain an *in camera* inspection from the district court, the defendant must "at least make some plausible showing" that documents in the government's possession contain information "both material and favorable to his defense" (internal quotation marks omitted)).[6]

---

[5]  (...continued)
2004. *See* Appellee's Br. 17. This letter is not in the record, and we base our decision only on the hearing and conference transcripts available to us.

[6]  In *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987), the Supreme Court outlined a general standard for determining when to grant an *in camera* inspection of governmental documents for *Brady/Giglio* responsive material. The Court explained that a defendant "may not require the trial court to search through [a governmental] file without first establishing a basis for his claim that it contains material evidence." *Id.* at 58 n.15; *see also id.* at 57 ("'[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Whether the defendant establishes such a basis may depend on "the degree of specificity of [the defendant's] request." *Id.* at 58 n.15. A defendant must "at least make some plausible showing" that the withheld material is "both material and favorable to his defense." *Id.* (internal quotation marks omitted).

"[M]ere speculation that a government file might contain *Brady* material is not sufficient." *United States v. Bland*, 517 F.3d
(continued...)

Such a review is the accepted procedure for resolving legitimate doubt about the existence of undisclosed material and one that balances the defendant's important need for access to potentially relevant material with the Government's valid interest in protecting confidential files and the integrity of pending investigations. *See Phillips*, 854 F.2d at 278.[7] Mr. Jumah did not make such a request of the district court and appears to have dropped the matter after the January 18, 2004 conference. The district court certainly was not obligated to conduct an *in camera* review *sua sponte*.

Mr. Jumah's theory that the Government withheld *Brady* and *Giglio* material is rendered all the more speculative by the evidence before us in the record. There was no evidence that the DEA ever provided Mr. Jumah with pseudoephedrine samples in the past. Mr. Jumah had ample opportunity to cross-examine the DEA agents who testified as Government witnesses about this matter and was unable to elicit any testimony supportive

---

[6]  (...continued)
930, 935 (7th Cir. 2008). Courts have applied this "plausible showing" standard in cases where the Government opposed a defendant's request for an *in camera* review. *See, e.g.*, *Davis v. Litscher*, 290 F.3d 943, 947-48 (7th Cir. 2002); *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002); *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001); *Love v. Johnson*, 57 F.3d 1305, 1313-15 (4th Cir. 1995).

[7]  Of course, the district court is under no independent duty to review government files for potential *Brady* material. *See Bland*, 517 F.3d at 935.

of his position. Nor was Mr. Jumah able to establish a pattern of obtaining information regarding criminal conduct and bringing it to DEA agents only after it "ripened into a possible sting." *See* Appellant's Br. 22. Indeed, the record demonstrates that the DEA did not permit Mr. Jumah to engage in actual pseudoephedrine deals without its close supervision and direction. Finally, we have no reason to believe that the Government maintained records about Qasem's past that would have been helpful to Mr. Jumah. Notably, Mr. Jumah had an opportunity to cross-examine Qasem about their prior relationship and failed to establish that they had had a pattern of drug dealings in the past. *See supra* note 2.

We have stated that, when evidence is in the exclusive control of the Government or has been destroyed by the Government, a defendant may establish that the Government suppressed exculpatory evidence without specifically identifying the allegedly suppressed evidence. *See Driver*, 798 F.2d at 251 n.1. On the other hand, we have also stressed that unsupported assertions that the Government has suppressed evidence are insufficient to make out a *Brady* or *Giglio* violation. *Id.* at 251; *see also United States v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985) ("A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court." (internal quotation marks omitted)). We must conclude, on the record before us, that Mr. Jumah's assertions remain unsupported. His failure to ask for an *in camera* inspection of the Government's records further counsels against

any relief from this court. The district court committed no error.

## B.

Mr. Jumah also contends that the district court erred in the imposition of the sentence. We review the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error. *See United States v. Turner*, 400 F.3d 491, 500 (7th Cir. 2005); *see also United States v. Garcia*, 413 F.3d 201, 221-24 (2d Cir. 2005) (explaining the standard of review and why the clear error standard of review for factual findings applies even though the ultimate issue is reasonableness). When no objection to sentencing guidelines calculations is made at trial, we review those calculations for plain error. *See United States v. Jaimes-Jaimes*, 406 F.3d 845, 847-49 (7th Cir. 2005). Under plain-error review, the defendant must show that (1) there was error, (2) it was plain, (3) it affected his substantial rights and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity or public reputation of the judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732-35 (1993); *Jaimes-Jaimes*, 406 F.3d at 847-49.

## 1.

At trial, the parties stipulated that Mr. Jumah had distributed approximately 1009.4 tablets of pseudoephedrine; the parties also accepted a chemist's report weighing the tablets at approximately 247.9 grams. Trial

Tr. at 170-71, Jan. 25, 2006.[8] In preparation for sentencing, the probation officer prepared a PSR that calculated Mr. Jumah's base offense level as 32. This calculation was pursuant to U.S.S.G. § 2D1.11(d)(6) and based on the assumption that the total weight of the pseudoephedrine pills was 253.9 grams.[9] However, the PSR did not consider the fact that the chemist's report also calculated the total weight of pure drug within the pills to be 60.47 grams. *See* Gov't App. at 25.

The sentencing hearing was held on April 9, 2008. On two occasions, Mr. Jumah's counsel stated that he did not object to the calculations in the PSR. *See* Tr. at 3, 7, Apr. 9, 2008. Hearing no objection, the district court accepted the calculations and findings of the PSR. *Id.* at 7-8. The district court determined that Mr. Jumah's base offense level was 32 and that the two-level obstruction of justice enhancement applied, bringing Mr. Jumah's base offense level up to 34. Based on that level and Mr. Jumah's criminal history category of I, the district court determined that Mr. Jumah's Guideline range was 151 to 188 months' imprisonment. *Id.*

---

[8] The parties now agree that the stipulation was slightly incorrect. Based on the chemist's report forming the basis of the stipulation, the total gross weight of the tablets was 253.9 grams. *See* Gov't App. at 25. Despite this inaccuracy in the stipulation, no additional factual hearing is needed since this unobjected to, documentary evidence is in the record.

[9] The PSR utilized the 2007 version of the Guidelines.

In his sentencing memorandum and at the sentencing hearing Mr. Jumah urged the district court to impose a lower sentence for several reasons. Mr. Jumah asserted that, because of his history of cooperation with the Government, he would suffer the risk of physical harm in prison. He urged the district court to depart from the Guidelines because, after serving his prison term, he likely would be deported to Israel; he believed that he would face a particular physical danger there because of the presence of individuals whom he had helped prosecute. He also asked the district court to consider that he would not be permitted to serve the last ten percent of his sentence in community confinement due to his immigrant status. He stressed his years of cooperation with the federal government and highlighted a letter from a DEA agent to the district court stating that Mr. Jumah was hardworking and "a man of his word," who had earned the agent's trust. R.181, Ex. 1. Finally, Mr. Jumah informed the district court that, during his time in prison, he had taken educational courses offered by the prison. The Government disputed the relevance or factual accuracy of some of those characteristics.

After calculating the Guidelines sentence, the district court stated that it had considered the nature of the offense and the fact that Mr. Jumah's conduct "resulted or could have resulted in the injury to other people that were going to use these drugs that [Mr. Jumah was] attempting to distribute." Tr. at 21, Apr. 9, 2008. The district court then stated that it had considered "the need for a sentence to provide just punishment, adequate deterrence and protection to the public . . . [and

Mr. Jumah's] history and characteristics." *Id.* Taking those considerations into account, the district court stated that "a sentence within the sentencing guideline range is necessary." *Id.* The district court then considered some of the unique characteristics raised by Mr. Jumah. Mr. Jumah's assertion that he would suffer the risk of physical harm in prison was not supported by "any reliable information . . . [and was] contrary to [his] recent history since coming to the attention of the Court." *Id.* Mr. Jumah's assertion that he would be deported to a place that presented a physical danger to him was not a proper consideration in fashioning a sentence and, in any event, was a problem of Mr. Jumah's own making because he had violated immigration laws. Finally, the district court stated that it thought that "the fact that [Mr. Jumah] will not be permitted to serve the last ten percent of [his] sentence with some kind of community confinement . . . supports a sentence at the low end of the guidelines." *Id.* at 22. Therefore, the district court sentenced Mr. Jumah to 151 months' imprisonment. *Id.* at 22-23.

On April 21, 2008, Mr. Jumah filed a *pro se* Federal Rule of Criminal Procedure 35 motion for correction of a sentence resulting from an arithmetical, technical, or other clear error. R.190.[10] On August 26, 2008, the district court

---

[10] Initially, the Rule 35 motion did not specifically reference the difference between the weight of the total tablets and the weight of the pure drugs within them. *See* R.190. However,

(continued...)

dismissed the motion for lack of subject matter jurisdiction. R.216.

**2.**

Mr. Jumah now submits that the district court committed two reversible errors during sentencing. First, Mr. Jumah contends that the district court relied on the wrong weight of the pseudoephedrine when calculating his base offense level; instead of using the amount of total weight of the pseudoephedrine tablets, the district court should have used the weight of pure drug within the tablets pursuant to U.S.S.G. § 2D1.11, note (C). *See United States v. Goodhue*, 486 F.3d 52, 59 (1st Cir. 2007). Mr. Jumah contends that he objected to the district court's calculations in his Rule 35 motion. Second, Mr. Jumah contends that the district court gave no meaningful consideration to the § 3553(a) factors, including those specifically raised by Mr. Jumah in his sentencing memorandum and at his sentencing hearing.

The Government contends that Mr. Jumah's Rule 35 motion was improper and untimely, and thus his first

---

[10] (...continued)

Mr. Jumah, through appointed counsel, supplemented the motion on August 11, 2008, and thereby disputed the district court's calculation of the Guidelines based on the weight of the pseudoephedrine tablets. *See* R.212. In that supplemental memorandum, Mr. Jumah also stated that he had mailed his original Rule 35 motion "within the prescribed time limit." *Id.* at 1 n.2.

objection was not preserved. Nevertheless, the Government admits that the district court committed plain error by basing its Guidelines calculations on the gross weight of the tablets, instead of the weight of the drugs within them. The Government opposes Mr. Jumah's second contention and maintains that the district court adequately considered the § 3553(a) factors, as well as the unique factors Mr. Jumah raised in his sentencing memorandum and at the sentencing hearing.

**a.**

We begin by noting that both parties now agree that it was plain error for the district court to use the gross weight of the pseudoephedrine tablets in calculating Mr. Jumah's sentence. *Compare* Appellee's Br. 30, *with* Appellant's Reply Br. 2. We agree. The Guidelines require district courts to calculate the base offense level using the weight of the recovered pseudoephedrine contained in the tablets, not the weight of the entire tablet. *See* U.S.S.G. § 2D1.11, note (C). Thus, there was plain error in the calculations. The error affected Mr. Jumah's substantial rights because, had the district court calculated the base offense level using the weight of the pure drugs, Mr. Jumah would have been entitled to the base offense level of 28 and, with the addition of the two-level enhancement, a total offense level of 30. With a total offense level of 30 and criminal history category of I, Mr. Jumah's Guideline range should have been 97 to 121 months' imprisonment, rather than the 151 to 188 months' imprisonment range calculated by the

district court. We shall exercise our discretion and remand this case to the district court for resentencing because, as both parties agree, the error seriously affected the fairness and integrity of the judicial proceedings before the district court.

### b.

Our examination of the record convinces us that the district court did not err otherwise with respect to its calculations or its statement of reasons. The district court explicitly stated that it had considered the § 3553(a) factors during the sentencing hearing. It also considered Mr. Jumah's history and personal characteristics. *See* Tr. at 21, Apr. 9, 2008. Although the district court did not state specifically that it had considered Mr. Jumah's history of cooperation with federal authorities, the DEA agent's letter or Mr. Jumah's completion of educational courses while in prison, we believe the record sufficiently indicates that the district court took these factors into consideration in fashioning its sentence. *See United States v. Martinez*, 520 F.3d 749, 752-53 (7th Cir. 2008) (holding that the district court need not make factual findings as to each of the sentencing factors but the record must show that the court considered them); *United States v. Dale*, 498 F.3d 604, 611-12 (7th Cir. 2007) (same). Indeed, its consideration of the pertinent factors appears comprehensive and thoughtful. In light of the district court's explicit consideration of several of Mr. Jumah's characteristics and its statement that it had considered Mr. Jumah's "history and characteristics," the district

court's statement of reasons was adequate. *See* Tr. at 21, Apr. 9, 2008.

## Conclusion

For the reasons stated in this opinion, we affirm in part and reverse in part the judgment of the district court and remand this case to the district court for re-sentencing. The district court shall recalculate the Guidelines based on the weight of the pure drugs within the pseudoephedrine tablets and impose a sentence accordingly. No other aspect of the sentence is subject to further action.

AFFIRMED in part;
REVERSED and REMANDED in part
with INSTRUCTIONS