In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2975

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VERITA D. HINES-FLAGG,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CR-00248 — **Lynn Adelman**, *Judge.*

ARGUED JANUARY 6, 2015 — DECIDED JUNE 16, 2015

Before FLAUM, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Verita Hines-Flagg and her nephew operated a fraud scheme based in Detroit. They stole identities and created fake identifications. Then they traveled to other states to open credit card accounts, bought merchandise, and returned to Detroit to sell the goods. After being caught, Hines-Flagg pled guilty to one count of conspiracy to commit mail and wire fraud and one count of ag-

gravated identity theft. At the sentencing hearing, the district court sentenced Hines-Flagg to three years for the conspiracy to commit mail and wire fraud and to a mandatory consecutive two-year sentence for aggravated identity theft, resulting in an aggregate five-year prison sentence. In calculating the Guidelines offense level, the court applied a two-level increase to the count for conspiracy to commit mail and wire fraud for relocating the fraud scheme to evade law enforcement under U.S.S.G. § 2B1.1(b)(10)(A). Hines-Flagg is challenging the application of this two-level increase. She argues that she neither relocated the fraud scheme to another jurisdiction nor did so with the intent to evade law enforcement. We find that the fraud scheme was not relocated for the purposes of U.S.S.G. § 2B1.1(b)(10)(A) and that the district court's application of the resulting two-level increase to the count for conspiracy to commit wire and mail fraud was a procedural error. Therefore, we vacate Hines-Flagg's sentence and remand for resentencing.

## I. BACKGROUND

In early October 2012, Verita Hines-Flagg, a lifetime resident of the Detroit area, and her nephew Benjamin Hines drove from Detroit to Milwaukee with the aim of opening fraudulent lines of credit at various retail stores in the Milwaukee area. The pair was going to use fake identification documents they had made back at Hines-Flagg's home in Detroit to purchase merchandise on credit from various stores. Once sufficient merchandise had been obtained, the pair planned to return home to Michigan to fence the merchandise.

Upon arriving in Milwaukee, Hines-Flagg opened credit accounts at a number of retail stores between October 2 and

4, 2012. However, on October 4 their plans went awry when local police received a complaint from a Kohl's Department Store in Brown Deer, Wisconsin regarding the opening of a suspicious credit account and the subsequent purchase of store merchandise on the account. The complaint also indicated that the two suspects were still in the store's parking lot. When the police arrived they found both Hines and Hines-Flagg in a vehicle filled with retail merchandise, valued at approximately $20,000, that had been purchased from several stores using fraudulent identification. Both Hines and Hines-Flagg were arrested.

Further investigation revealed that Hines-Flagg and others had leased the car, a Lincoln MKZ, from an Illinois car dealership in June 2012 using fraudulent identification. Additionally, Hines-Flagg and her co-actors had fraudulently leased four other luxury vehicles between June 24 and June 28 from various Illinois car dealerships. The additional vehicles were recovered in Michigan in the possession of friends or family of Hines and Hines-Flagg.

Following his arrest, Hines explained to police how the fraud scheme operated. First, Hines-Flagg would identify various potential victims who resided in states other than Michigan who had a good credit history. Once the victims were selected, Hines-Flagg and her co-actors would obtain the victims' credit reports and make fake identifications using her home computer in Detroit. Then, Hines and Hines-Flagg would travel to other states,[1] approximately twice a year, to open store credit card accounts and shop using the fraudulent identifications. The pair would typically bring

---

[1] Hines and Hines-Flagg traveled to Ohio, Wisconsin, and Illinois.

three or four fake identifications when they left from Detroit to make fraudulent purchases. And they would not hit a town more than twice in order to cut down on the chances of getting caught. After the purchasing sprees, the merchandise was brought back to Detroit to be fenced or kept for personal use.

In December 2013, a grand jury in the United States District Court for the Eastern District of Wisconsin returned a six-count indictment against Hines-Flagg. She was charged with one count of conspiracy to commit mail and wire fraud (18 U.S.C. § 1341) and five counts of aggravated identity theft (18 U.S.C. § 1028A). On April 29, 2014, Hines-Flagg pled guilty to the conspiracy to commit mail and wire fraud count and one count of aggravated identity theft.

The plea agreement reflected the government's intent to recommend a two-level increase to the offense level under U.S.S.G. § 2B1.1(b)(10)(A). The presentence report also recommended the same two-level sentencing enhancement. U.S.S.G. § 2B1.1(b)(10)(A) prescribes a two-level increase if the defendant (1) relocated, or participated in relocating, a fraudulent scheme to another jurisdiction, and (2) did so to evade law enforcement (or regulatory officials). Hines-Flagg objected to the increase on the grounds that she neither relocated the scheme to another jurisdiction nor did so with the intent to evade law enforcement.

On August 21, 2014, the district court rejected these arguments and sentenced Hines-Flagg to 36 months (three years) for the fraud conspiracy and to a mandatory consecutive two-year sentence for aggravated identify theft, resulting in a total sentence of five years in prison. The court also imposed a supervised release term of three years. In calculat-

ing the offense level for the conspiracy to commit mail and wire fraud count, the court applied the two-level increase for relocating the fraud scheme to evade law enforcement.[2] Hines-Flagg appeals.

## II. ANALYSIS

On appeal, Hines-Flagg once again argues that the two-level increase to the offense level under U.S.S.G. § 2B1.1(b)(10)(A) to the fraud conspiracy count was improperly applied because the fraud scheme was never relocated and alternatively, even if the scheme was relocated, it was not relocated to evade law enforcement.

We generally "review the district court's application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010). U.S.S.G. § 2B1.1(b)(10)(A) requires a two-level increase if "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement." Therefore, the inquiry into whether U.S.S.G. § 2B1.1(b)(10)(A) is applicable has two prongs: (1) whether the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction and (2) whether the relocation was done with the intent to evade law enforcement. *Id.*; *United States v. Savarese*, 686 F.3d 1, 15 (1st Cir. 2012). The Guidelines and their commentary do not define "relocated" or "evade."

---

[2] As a result of the two-level increase, Hines-Flagg's Guidelines range on the mail fraud count was 41–51 months based on an offense level of 22 and a criminal history of I. Without the enhancement, her range would have been 33–41 months.

**A. There Was No Relocation of the Scheme Under U.S.S.G. § 2B1.1(b)(10)(A).**

The history of the provision indicates that the Sentencing Commission added the enhancement to the Guidelines in order to "address conduct that the Commission ha[d] been informed often relates to telemarketing fraud, although the conduct also may occur in connection with fraudulent schemes perpetrated by other means." U.S.S.G. app. C (2003). Specifically, "testimony offered at a Commission hearing on telemarketing fraud indicated that telemarketers often relocate their schemes to other jurisdictions once they know or suspect that enforcement authorities have discovered the scheme." *Id.*

With this history in mind, we turn first to Hines-Flagg's argument that she did not relocate the fraudulent scheme to another jurisdiction. Hines-Flagg does not contest the factual findings of the district court. Instead, she limits her argument to the meaning of "relocated." She argues that this court should define "relocate" as the moving of something with a fixed location, like one's residence or place of business, from one place to another, which she contends is the everyday meaning of the word, referencing Dictionary.com. *See United States v. Taliaferro*, 211 F.3d 412, 415 (7th Cir. 2000) ("In the absence of a definition of a term in the guidelines, courts are to look to the common-law definition or the plain meaning of the term."). Under her definition, Hines-Flagg's temporary trips to other jurisdictions to fraudulently purchase merchandise would not amount to a relocation under the Sentencing Guidelines.

We find that Hines-Flagg's scheme was not relocated under U.S.S.G. § 2B1.1(b)(10)(A). The Guidelines language

"clearly refers to relocation of the *scheme* only, not the relocation of the defendant." *United States v. Paredes*, 461 F.3d 1190, 1193 (10th Cir. 2006) (emphasis in original). We do not believe that this Guideline applies to every fraudulent scheme that just happens to operate in multiple jurisdictions. The Guideline does not state that it applies to fraudulent schemes that operate in or cross multiple jurisdictions, nor does any commentary on this sub-section indicate such an application. Hines-Flagg's scheme was always meant to operate in multiple locations, with Detroit as its home base. In other words, it was always located in multiple jurisdictions. Therefore, the scheme was not "*re*located" to Wisconsin, Ohio, and Illinois when Hines-Flagg traveled to those locations for temporary trips and returned to Detroit.

In *United States v. Morris*, the Eleventh Circuit found no relocation where the defendants operated a fraudulent scheme in the Atlanta area and surrounding districts of stealing credit cards, using those credit cards to purchase electronics, and fencing the merchandise. 153 F. App'x. 556, 557–58 (11th Cir. 2005) (unpublished opinion). In reaching its decision, the court adopted the "ordinary meaning" of "relocate," defining it as "to 'establish or lay out in a new place.'" *Id.* at 558 (quoting *Webster's 3d New Int'l Unabridged Dictionary* 1919 (1976)). At sentencing, the government produced the testimony of a co-defendant who said that the conspirators would sometimes go out of town to engage in credit card fraud, including to Albany (in the Middle District of Georgia), the Carolinas, Texas, Alabama, Mississippi, Ohio, and Arkansas. *Id.* The district court applied the enhancement, but the Eleventh Circuit reversed, finding that the government's evidence of the defendant venturing outside of the Northern District of Georgia did not establish a reloca-

tion under the ordinary meaning of the term. *Id*. Rather, the court said, the out of town trips were meant to be temporary and amounted to "an expansion, and not a relocation, of the conspiracy." *Id*. In support of its holding, the court indicated that the primary location of the scheme was always Atlanta. *Id*. The court specifically noted that the fraudulently obtained merchandise was always delivered to, and eventually fenced from, the same location in Atlanta. *Id*. This indicated a strong connection to Atlanta that the defendants never attempted to sever or relocate. *See id*.

Similarly here, we find no indication that Hines-Flagg relocated the fraudulent scheme under the common understanding of the term. *See id.* at 558. The plan was always that the stolen merchandise would be returned to and fenced in Detroit. Detroit was the hub of Hines-Flagg's operations and the temporary trips to other states operated as spokes. *Cf. Savarese*, 686 F.3d at 15. In *Savarese*, the First Circuit reserved judgment on whether to officially adopt a hub and spoke approach to evaluating relocation under U.S.S.G. § 2B1.1(b)(10)(A), the hub and spoke theory being that where a fraudulent scheme operates with one hub and several spokes, the scheme is not "relocated" when the defendant travels to different spokes as part of the scheme. *Id.* However, the court applied the framework to demonstrate the flaws in the defendant's argument, affirming application of the enhancement. *Id.* It found that because the components of the scheme that occurred outside of Boston (the defendant's city of residence) were "at least as critical, if not more so, to the operation's success than any of its other elements" that occurred in Boston, these acts comprised the true "heart of the enterprise" and "the fact that other tangential elements recurred in a convenient geographic locale [Boston]" did not

render that location the scheme's "hub." *Id.* Instead, the scheme "might best be described not as hub with spokes, … but as two hubs adjoined." *Id.* It found that because at least one of the hubs moved across jurisdictions, the district court did not clearly err in applying the enhancement. *Id.* at 15–16.

Hines-Flagg's scheme is more similar to the one in *Morris* than the one in *Savarese*. Like Atlanta in *Morris*, Detroit played a central role in Hines-Flagg's scheme. Hines-Flagg procured all the fraudulent identities, created the fake identifications, and fenced the stolen merchandise all in Detroit. Were we to use *Savarese*'s approach, Detroit would be "the heart of th[is] enterprise," 686 F.3d at 15. Under our analysis, the trips to other jurisdictions were certainly part of the scheme, but they do not amount to a relocation, since the scheme was always set up to operate multi-jurisdictionally. The district court erred in applying the two-level enhancement during Hines-Flagg's sentencing.

Because we find an error occurred based on the district court's interpretation of relocation under U.S.S.G. § 2B1.1(b)(10)(A), we do not need to rule on whether any hypothetical relocation was done "to evade law enforcement." However, we note that most criminal enterprises are set up to avoid getting caught. Based upon the plain language of the Guideline, we believe application of this enhancement requires more than just the operation of a multi-jurisdictional scheme in order to reduce the chances of detection. *Cf. Paredes*, 461 F.3d at 1192 (determining that the scheme relocated "to evade law enforcement" where fraudulently obtained goods "moved from Utah to Idaho because Utah became 'hot' after one of the [participants] was arrested"); *United States v. Smith*, 367 F.3d 737 (8th Cir. 2004) *vacat-*

*ed and remanded on other grounds*, 543 U.S. 1103 (2005) (finding that evidence established that the defendant—who operated a fraud scheme in Iowa and then moved permanently to Florida and began operating a fraud scheme there—moved in order to evade law enforcement where he had been arrested several times for fraud and other crimes in Iowa and a warrant for his arrest was outstanding in Iowa). *But see United States v. Vega-Iturrino*, 565 F.3d 430, 433 (8th Cir. 2009) (finding that relocation need not "be motivated by a 'specific' threat of arrest as opposed to a more general intent to evade law enforcement").

**B.  The Enhancement Error Was Not Harmless.**

We turn now to whether the error by the district court in applying the enhancement was harmless. "It is important to emphasize that … our harmless error determination and review of the sentence's reasonableness are separate" inquiries. *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). First, we must determine whether the district court's sentencing is procedurally sound. *Id*. Second, if the district court's sentencing is procedurally sound we must "then consider the substantive reasonableness of the sentence under an abuse-of-discretion standard." *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

The district court must correctly understand what the Guidelines recommend. *United States v. Allredge*, 551 F.3d 645, 647 (7th Cir. 2008). After getting the Guidelines right, it has discretion to take the individual defendant's circumstances into account. *Id*. However, the "recognition that some Guideline miscalculations can be harmless does not change these basic principles." *Abbas*, 560 F.3d at 667. "It merely removes the pointless step of returning to the district court

when we are convinced that the sentence the judge imposes will be identical to the one we remanded." *Id.* Therefore, to prove harmless error, the government must be able to show that the guidelines error "did not affect the district court's selection of the sentence imposed." *Id.* When a Guidelines range is miscalculated, we have historically looked for an unequivocal statement by the sentencing court that it would have imposed the same sentence under a correct application to find harmless error. *See id.*; *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008).

Here, we have found that the district court improperly applied U.S.S.G. § 2B1.1(b)(10)(A) to Hines-Flagg's sentence and therefore miscalculated the Guidelines range. This mistake constitutes a significant procedural error. *See Gall*, 552 U.S. at 51; *Abbas*, 560 F.3d at 666. The government offers no "firm assurances" that the district court would have imposed the same sentence if it had properly calculated the Guidelines. *See United States v. Zahursky*, 580 F.3d 515, 528 (7th Cir. 2009). And the district court did not state that it would have imposed the same sentence without application of the enhancement. Therefore, we find the misapplication of U.S.S.G § 2B1.1(b)(10)(A) was not harmless error. Because we find a reversible procedural error in the application of U.S.S.G. § 2B1.1(b)(10)(A), we do not need to make a determination as to whether Hines-Flagg's sentence was nevertheless reasonable.

## III. CONCLUSION

For the foregoing reasons, we VACATE Hines-Flagg's sentence and REMAND for resentencing in accordance with this opinion.

FLAUM, *Circuit Judge*, dissenting.

It is my view that Verita Hines-Flagg relocated her fraud scheme to another jurisdiction for the purpose of evading law enforcement and structured her entire scheme in such a way as to do precisely that. Accordingly, I respectfully dissent.

Though the Brown Deer police did not know it when they arrested Hines-Flagg and her nephew, the two had driven from Detroit to Milwaukee to effectuate a scheme that they had previously carried out in various venues throughout Illinois, Ohio, and Wisconsin. The scheme worked as follows: the duo used fake identification to open lines of credit at various retail stores in the names of real people to fraudulently purchase merchandise in large quantities. They carried out the scheme in each town that they hit, before moving on to avoid detection by law enforcement. It is my judgment, therefore, that the district court's application of U.S.S.G. § 2B1.1(b)(10)(A)—permissible when a "defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials"—was appropriate.

The majority grounds its position in the fact that Hines-Flagg planned her scheme at her home in Detroit and returned there after each out-of-town trip to sell her fraudulently-obtained goods. In the majority's words, the "scheme was always meant to operate in multiple locations, with Detroit as its home base. In other words, it was always located in multiple jurisdictions." I view Hines-Flagg's criminal operation differently. Hines-Flagg, of course, had a tie to Detroit (that's where she lived), but the heart of the scheme—indeed, the fraud itself—traveled from place to place. There-

fore, I agree with the majority's statement that the scheme was always meant to operate in multiple locations; it was, by design, a scheme that moved around. But I disagree that it was *always* located in multiple jurisdictions; the suggestion is that the scheme somehow was operating in more than one jurisdiction simultaneously. I cannot adopt such a characterization of the defendant's conduct. I see the scheme as being relocated with Hines-Flagg to each jurisdiction in which she performed it.

The district court found that Hines-Flagg and her nephew consciously chose not to perform the scheme in the state of Michigan; rather, they only victimized stores in Ohio, Illinois, and Wisconsin. And prior to leaving home for these out-of-state "shopping" trips, the pair packed all the materials they needed to conduct their scheme: a disguise kit (including wigs), the personal identity information for their victims (SSN, DOB, and address), counterfeit Michigan driver's licenses, a list of where the victims had accounts so they would know what stores to hit, a credit card reader, and materials for making ID cards. They fraudulently leased cars—like the Lincoln, leased in Illinois, that they drove on the day of their arrest in Brown Deer—to use on their trips. And they made sure not to conduct their scheme in the same location more than twice. Thus, it is evident to me that Hines-Flagg relocated her fraud scheme from jurisdiction to jurisdiction for the purpose of evading law enforcement.[1]

---

[1] Perhaps the clearest indicator that their scheme was designed to evade law enforcement is the difficulty that law enforcement had—on account of the scheme's relocating quality—in tying Hines-Flagg's frauds to the same individual. Hines-Flagg initially was charged in Milwaukee Coun-

In reaching its conclusion, the majority relies on an un-published, per curiam decision from the Eleventh Circuit, *United States v. Morris*, 153 F. App'x 556 (11th Cir. 2005) (reversing an application of the relocation enhancement), and distinguishes the facts here from those in the First Circuit's decision in *United States v. Savarese*, 686 F.3d 1 (1st Cir. 2012) (affirming the relocation enhancement's application). Although the facts of this case arguably are more analogous to those at issue in *Morris*, I find the logic employed in *Savarese* to be more persuasive (though I emphasize that neither decision devotes significant attention to the relocation enhancement issue).

In *Morris*, the defendant ran a scheme in which he stole credit cards and driver's licenses from lockers at various Atlanta-area health clubs, then used them to buy electronic equipment at retail stores. 153 F. App'x at 557. After fraudulently obtaining the goods, Morris's co-defendant would

---

ty Circuit Court with misappropriating identification information. Following the completion of a three-month sentence, she was extradited to Cook County, Illinois, on identity theft charges related to the leased vehicle. She remained in custody there until November 27, 2013, when she was brought to the Eastern District of Wisconsin for an initial appearance on the criminal complaint in this case. As the government describes it, a year after her arrest by the Brown Deer police, "after local and state authorities and federal authorities worked together extensively … they discovered that when Hines-Flagg was arrested on October 4, 2012 [in the Kohl's parking lot], she was in the throes of committing a pre-planned and well thought-out fraudulent scheme similar to others that she had done many times in the past." The Illinois case then was dropped, and a federal indictment followed.

then sell them on eBay from his home in Marietta, Georgia. *Id.* Almost all of the stores victimized by Morris were in the Northern District of Georgia, with the exception of a few in Albany—a city in Georgia's Middle District. *Id.* at 558. (Although a different co-defendant visited the Carolinas, Texas, Alabama, Mississippi, Ohio, and Arkansas as part of the conspiracy, it's unclear as to whether that co-defendant committed credit card fraud in those locations. *Id.*)

The Eleventh Circuit reversed the district court's application of the relocation enhancement, agreeing with Morris that "his conduct could not be described as 'relocating': at best, his conduct showed that he operated in multiple locations but always sold the merchandise to [his co-defendant], who remained in the same location." *Id.* at 558. In doing so, the court noted that "the government presented no evidence that [Morris] or any member of the conspiracy tried to 'relocate' the scheme to another jurisdiction, under the ordinary meaning of that word." *Id.*

I am unpersuaded by the majority's extension of *Morris* to the facts of our case, as the facts of *Morris* differ in a critical respect. There, the fraudulent conduct occurred largely within one federal jurisdiction, the Northern District of Georgia—the same jurisdiction in which Morris lived and where his home base was situated. Morris *did* make purchases in one town located in the *Middle* District of Georgia, but there is no suggestion that he crossed federal-jurisdictional lines for the purpose of evading law enforcement. Here, by contrast, Hines-Flagg intentionally victimized stores in different federal jurisdictions, spanning several different states—all to minimize the odds of being caught.

In any event, I find the First Circuit's logic in *Savarese* to be more convincing. *Savarese*, like *Morris*, involved credit cards stolen from gym locker rooms. 686 F.3d at 5. After obtaining the cards, Savarese would fax a list of the cardholders' names, as well as forged replica signatures, to his associates in Boston, who would make false identification for Savarese and others using the information. *Id.* Armed with the false documents, Savarese and his cohorts then traveled to over a dozen states throughout the country to withdraw large cash advances in their victims' names. *Id.* at 5–6. On appeal, Savarese challenged the district court's imposition of the two-level relocation enhancement, urging the court to adopt the "hub and spokes" approach (as the court described it) of *Morris*. *Id.* at 15. The court, however, upheld the application of the enhancement (while purporting to reserve judgment as to the validity of the Eleventh Circuit's logic, deeming that theory factually inapplicable). *Id.* at 15.

Though Savarese stole the credit cards and communicated with his cohorts at the scheme's home base in Boston, the court reasoned: "The theft and fraudulent use of the credit cards seems to us at least as critical, if not more so, to the operation's success than any of its other elements; indeed, these acts comprised the heart of the enterprise. Their transitory nature does not undermine their centrality to the scheme, and conversely, the fact that other tangential elements recurred in a convenient geographic locale does not necessarily render that location the scheme's effective 'hub.'" *Id.* at 15. The court went on: "More accurately, then, the structure of the fraudulent scheme might be best described not as a hub with spokes, as was the case in *Morris*, but as two hubs adjoined … ." *Id.* at 15. "Because at least one of those hubs moved across jurisdictions, and did so with the primary in-

tent to evade law enforcement," the First Circuit upheld the enhancement's application. *Id.* at 15–16. I would apply that same reasoning here.

Hines-Flagg contends that, in enacting the relocation enhancement, the Sentencing Commission sought to increase sentences for telemarketing schemes, which often relocate to evade ongoing law enforcement investigations. Therefore, she argues, it should not apply to her since she never relocated her scheme while being actively pursued by the authorities. I reject that logic. First, the most successful fraudsters are those that structure their schemes in ways as to avoid detection, so it seems unlikely that the Sentencing Commission would exempt those particularly sophisticated defendants from the enhancement at issue here. Second, telemarketing schemes were just one of many fraud schemes that the Sentencing Commission sought to curb in enacting the enhancement. *See United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002) (discussing the enhancement's broader purpose). The background notes to U.S.S.G. § 2B1.1(b)(10)(A) expressly state that the guideline "covers offenses involving theft, stolen property, property damage or destruction, fraud, forgery, and counterfeiting … ." And it emphasizes that "most fraud statutes cover a broad range of conduct with extreme variation in severity."

Moreover, the plain text of the enhancement—again, applicable when a "defendant relocated … a fraudulent scheme to another jurisdiction to evade law enforcement"—appears to squarely implicate the conduct at issue here. While the enhancement assuredly covers uprooted telemarketing schemes, I read it to also include the conduct of Hines-Flagg, who opened fraudulent lines of credit to steal

goods and then intentionally performed that same scheme in other jurisdictions to avoid being caught by law enforcement. Even if it fairly can be said that the home base of Hines-Flagg's scheme was in Detroit, the critical part of the scheme was the fraud itself. And it was that part that she relocated to different jurisdictions to evade authorities.

Accordingly, I would affirm the district court's application of U.S.S.G. § 2B1.1(b)(10)(A) in this case.