# United States Court of Appeals
## For the First Circuit

No. 10-1726

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS SAVARESE,

Defendant, Appellant.

No. 10-1842

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES DESIMONE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Richard B. Klibaner, with whom Klibaner & Sabino was on brief, for appellant Dennis Savarese.
Paul J. Garrity for appellant James Desimone.

Cynthia A. Young, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney was on brief, for appellee.

July 11, 2012

**HOWARD, <u>Circuit Judge</u>**.   Defendants-appellants Dennis Savarese and James DeSimone were indicted, along with several alleged co-conspirators, on various charges arising from their participation in a substantial credit card fraud scheme.   Savarese was convicted after a six-day jury trial, while DeSimone, who elected to forgo his Sixth Amendment rights, pled guilty.[1]   In these consolidated appeals, they raise a myriad of issues for our review, ranging from the sufficiency of the underlying indictment to the applicability of multiple sentence enhancements.   For the reasons that follow, we affirm in all respects.

## I. Background

We rehearse the pertinent facts in the light most agreeable to the verdict, <u>United States</u> v. <u>Pelletier</u>, 666 F.3d 1, 3 (1st Cir. 2011), deferring some details to our analysis of the issues raised on appeal.

In early August 2007, Dennis Savarese and James DeSimone were arrested outside the Prairie Meadows Racetrack in Altoona, Iowa.   Found in their possession were, among other items, six stolen credit cards, each with a corresponding false identification bearing the cardholder's name, but Savarese's or DeSimone's

---

[1] The indictment also named Donald DeSimone, Sr., Donald DeSimone, Jr., Richard Regnetta, and Arthur Rizzo as additional defendants.   DeSimone Sr. died while awaiting trial, and the remaining defendants pleaded guilty to related charges.   This appeal disposes only of the claims raised by current defendants-appellants Dennis Savarese and James DeSimone.

picture.    The arrests marked the culmination of a lengthy investigation, which uncovered a fraud operation spanning more than a dozen states and involving hundreds of stolen identities.

That operation, though simple in concept, was assiduously executed by co-defendants Dennis Savarese, Richard Regnetta, Arthur Rizzo, and the DeSimone family (James, Donald Sr., and Donald Jr.) -- all of whom, except for Savarese, resided in the greater Boston area.    Between November 2005 and August 2007, Savarese visited nearly 150 different Bally Total Fitness and 24-Hour Fitness clubs across the United States.    By all accounts, these visits were devised not to achieve some pinnacle of physical fitness, but rather to steal credit cards from the storage lockers of unsuspecting gym members.    On a periodic (often weekly) basis, Savarese compiled and faxed to his associates a list which identified the name on each stolen credit card, forged attempted replicas of the cardholders' signatures, and specified which co-defendant would ultimately use the cards in the scheme's subsequent phases.

Armed with this list, one or more of the defendants -- usually Arthur Rizzo or, after Rizzo's December 2006 arrest, James DeSimone -- would commission Boston-based photographers Dana Ross Studios to manufacture corresponding false identifications, each of which contained a name from one of the stolen cards, a picture of one of the defendants, and otherwise fictional biographical

information. When enough credit cards and identifications were collected, a select group of the defendants would congregate at racetracks and various other gambling establishments of Savarese's choosing throughout the country. There, they used the false documentation to withdraw significant cash advances, to the tune of almost $430,000 over the life of the scheme.

In due course, a federal grand jury sitting in the District of Massachusetts returned a 28-count indictment against the six defendants, charging them with, inter alia, conspiring to commit aggravated identity theft, 18 U.S.C. § 1028A, identity fraud, 18 U.S.C. § 1028(a)(7), access device fraud, 18 U.S.C. § 1029(a)(2), and wire fraud, 18 U.S.C. § 1343, all in violation of 18 U.S.C. § 371. Savarese was separately charged with two counts of aggravated identity theft and two counts of identity fraud, while DeSimone faced seven individual counts of aggravated identity theft and one count of access device fraud. DeSimone pled guilty to all but two counts of aggravated identity theft and was sentenced to 81 months' imprisonment. Savarese, after trial, was convicted on all but one count of identity fraud. The district court denied his motion for acquittal, Fed. R. Crim. P. 29, and imposed a 168-month sentence. These timely appeals ensued.

## II. Analysis

The appellants marshal an extensive list of grievances about the proceedings below. Specifically, Savarese attacks his

conviction, alleging three defects:  that the indictment pursuant to which he was tried was fatally deficient; that there was insufficient evidence to support his lone conviction for identity fraud; and that the trial court abused its discretion on three evidentiary rulings.  Savarese and DeSimone also challenge their respective sentences, arguing that the district court improperly applied several sentencing guideline enhancements.  We consider each of these claims in turn.

### A. Dennis Savarese

### 1. Challenge to the indictment

Savarese first contends that the indictment was defective because it failed to adequately allege the "means of identification" element of aggravated identity theft.  See 18 U.S.C. § 1028A.  We review a preserved challenge to the sufficiency of the indictment de novo.  United States v. Lopez-Matias, 522 F.3d 150, 153 (1st Cir. 2008).

In general, an indictment is adequate if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy.  United States v. Sepulveda, 15 F.3d 1161, 1192 (1st Cir. 1993).  An indictment that tracks the language of the underlying statute is usually sufficient to meet this standard, "provided . . . that the excerpted statutory language sets out all . . . elements of the offense without

-6-

material uncertainty." United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010). In other words, the indictment may use the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged. United States v. Mojica-Baez, 229 F.3d 292, 309 (1st Cir. 2000).

Here, the grand jury charged Savarese with two counts of aggravated identity theft, an offense described by statute as follows:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1). The relevant counts of the indictment state, in pertinent part, that:

> On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendants listed below did knowingly transfer, possess, and use, in or affecting interstate commerce, without lawful authority, a means of identification of another person – to wit, the individual's name – during and in relation to the commission of access device fraud . . . and wire fraud.

Immediately below this general description, an accompanying chart identifies the count, the defendant being charged ("Dennis Savarese"), the dates of the alleged conduct ("9/15/06" and "8/2/07"), and the initials of the purported victims ("D.A." and

"G.C."). Prior sections of the indictment also chronicle one of the § 1028A offenses at length, recounting in some detail the facts surrounding Savarese's theft of G.C.'s credit card from a Bally's gym in Houston, Texas, and his use of the card shortly thereafter to withdraw $950 at the Prairie Meadows Racetrack.

Thus, with respect to both counts of aggravated identity theft, the indictment faithfully tracks the language of the statute, and notifies Savarese not only of the elements of the crimes charged, but also of the relevant facts. Neither count is deficient under the applicable standards. See United States v. Pena, 448 Fed. App'x 43, 44-45 (11th Cir. 2011) (finding indictment sufficient where it charged the accused, under 18 U.S.C. § 1028A, with "knowingly possess[ing] and us[ing], without lawful authority, a means of identification of another person, that is, the date of birth of 'W.P.'"); United States v. Dvorak, 617 F.3d 1017, 1026-27 (8th Cir. 2010) (finding same where indictment charged that the accused "did knowingly use without lawful authority a means of identification of another person"); United States v. Jenkins-Watts, 574 F.3d 950, 968-69 (8th Cir. 2009) (finding same where indictment charged that the accused "did knowingly and without lawful authority transfer, use, and possess one or more means of identification of another person, namely XXXX, during and in relation to a predicate felony offense, that being access device fraud").

Savarese disagrees, rejoining that the indictment's only reference to a means of identification -- "to wit, the individual's name" -- is not enough.  A name, he claims, without more, cannot constitute a "means of identification" for purposes of aggravated identity theft.  The language of § 1028, however, plainly contradicts this theory, defining a "means of identification" as "<u>any name</u> or number that may be used, <u>alone or in conjunction with any other information</u>, to identify a specific individual, <u>including any</u> . . . <u>name</u>, social security number, date of birth, [or] official State or government issued driver's license or identification number . . . ."  18 U.S.C. § 1028(d)(7)(A) (emphasis added).

At least one court has held that, under certain conditions, a name alone may not sufficiently "identify a specific individual" to satisfy this definition, <u>see</u> <u>United States</u> v. <u>Mitchell</u>, 518 F.3d 230, 236 (4th Cir. 2008), but Savarese's singular reliance on <u>Mitchell</u> is misplaced.  There, the defendant challenged the sufficiency of the evidence supporting the "means of identification" element, not the legal sufficiency of the charging instrument; these are two wholly independent inquiries.  Where, as here, a defendant seeks dismissal of the indictment, the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged

-9-

offense.  Because that question does not necessitate any examination of the evidence, <u>Mitchell</u> is presently inapposite.  <u>See</u> <u>id.</u> at 235-36 (granting a motion for judgment of acquittal on the ground that, under the circumstances presented, a name alone was insufficient evidence to prove, beyond a reasonable doubt, that the defendant had used a "means of identification" of another person); <u>see also</u> <u>United States</u> v. <u>Guerrier</u>, 669 F.3d 1, 3-4 (1st Cir. 2011) ("[C]ourts routinely rebuff efforts to use a motion to dismiss [an indictment] as a way to test the sufficiency of the evidence behind an indictment's allegations."); <u>United States</u> v. <u>Innamorati</u>, 996 F.2d 456, 477 (1st Cir. 1993) ("The government need not recite all of its evidence in the indictment.").[2]

In sum, we find no infirmity in the wording of the indictment.  It describes the statutorily defined elements of the charged crimes, the general factual scenario on which the charges rest, and the connection between those elements and facts.  It clearly identifies the targeted victims of aggravated identity theft and the dates on which those instances allegedly occurred,

---

[2] Nor could Savarese sensibly argue that the evidence presented at trial was insufficient to prove the "means of identification" element beyond a reasonable doubt.  A wealth of evidence demonstrated that he unlawfully used not only another person's name, but also the person's credit card information, which, in combination, was precisely the type of "means of identification" contemplated by Congress in enacting 18 U.S.C. § 1028A.  <u>See, e.g.</u>, H.R. Rep. No. 108-528, at 4-6, <u>as reprinted</u> in 2004 U.S.C.C.A.N. 779, 780-81 (noting that forty-two percent of identity theft complaints involve credit card fraud, and identifying credit card fraud as the primary targeted conduct).

giving Savarese more than adequate notice of the charges against which he was required to defend. Accordingly, we reject this assignment of error.

## 2. **Sufficiency of the evidence**

We turn next to Savarese's claim that the record does not support his identity fraud conviction and that, therefore, the district court should have granted his motion for judgment of acquittal on this count. See Fed. R. Crim. P. 29. We evaluate sufficiency challenges de novo, determining whether any rational juror could have found the disputed facts beyond a reasonable doubt. United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). In making this determination, we consider the evidence (both direct and circumstantial) in the light most favorable to the verdict, eschewing credibility judgments and drawing all reasonable inferences in favor of the prevailing party. See United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999).

Congress defined the essential elements of identity fraud as "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person with the intent to commit, or to aid and abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." 18 U.S.C. § 1028(a)(7). Pursuant to that provision, the indictment alleged the following: that on July 13, 2007, Savarese

-11-

stole a credit card from "T.M."'s locker at a Bally's gym in Houston, Texas; that on the same day, James DeSimone purchased a false identification from Dana Ross Studios containing T.M.'s name, and DeSimone's picture; and that DeSimone then flew to Arizona, where he met Savarese and used T.M.'s credit card to withdraw $2,000 at the Phoenix Greyhound Racetrack.

Savarese submits that because the government offered no evidence that he used T.M.'s stolen credit card, and insufficient evidence to prove beyond a reasonable doubt that he was the individual who stole it (i.e., possessed or transferred it), the district court should have granted his motion for acquittal. We disagree and, in this instance, need not linger. The government adduced compelling evidence of identity fraud, and a rational jury could easily have found beyond a reasonable doubt -- as the jury did here -- that Savarese was guilty of at least aiding and abetting the crime charged.

That Savarese possessed and transferred T.M.'s means of identification (T.M.'s name and credit card) in furtherance of the scheme is plainly inferable from the evidence. Donald DeSimone Jr. testified that Savarese acquired, by theft, all of the credit cards used in the fraud. This was consistent with the testimony of Richard Regnetta, who similarly described the scheme's (and Savarese's) methods of operation. Further, the victim (T.M.) testified that his credit card vanished shortly after he visited a

-12-

Houston-area Bally's on a Friday in July of 2007, and both documentary and testimonial evidence indicated that Savarese's membership card was scanned at two different Bally's locations in that vicinity on Thursday, July 12 and Friday, July 13, 2007.[3]

Records and security camera footage additionally showed that a person using the name "Dennis Savarese," and using Savarese's personal credit card, rented a car at the Phoenix airport on July 14, 2007 -- the same day that James DeSimone, with an unidentified accomplice, withdrew a $2,000 cash advance at the Phoenix Greyhound Racetrack using T.M.'s credit card. Other evidence, including transaction records and copies of false identifications containing Savarese's picture, demonstrated that Savarese was actively participating in the scheme during this general time frame.[4]

In an effort to blunt the force of this evidence, Savarese declares the verdict a product of mere "guesswork and speculation." His argument is unpersuasive. To be sure, in conducting a sufficiency analysis, a reviewing court "should not

---

[3] There may have been as many as five different Bally's locations in the Houston area. It is unclear from the record -- and appears to have been undiscernible at trial -- exactly which of these locations T.M. and/or Savarese had visited. This alone, however, does not compromise the government's case.

[4] Savarese's contention that there was no evidence of his continued participation in the scheme is undermined by the fact that, within weeks of the "T.M." withdrawal, he was arrested in the company of co-defendant James DeSimone while possessing multiple stolen credit cards and false identifications.

give credence to evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative," United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995), but we find no such shortcomings here.  Although the evidence is largely circumstantial, the jury reasonably could have concluded that Savarese stole, transferred, and aided and abetted DeSimone's fraudulent use of T.M's name and credit card.  See United States v. Castro-Lara, 970 F.2d 976, 981 (1st Cir. 1992) (explaining that "circumstantial evidence, in and of itself, is often enough to ground a conviction").  In reaching this conclusion, none of the necessary inferences were unduly speculative, and the fact that the jury acquitted Savarese on the second count of identity fraud indicates that it was neither prevented from making reliable judgments about guilt or innocence, nor unable to weigh the evidence independently as to each count of the indictment.  See United States v. Flores-Rivera, 56 F.3d 319, 326 n.2 (1st Cir. 1995) (acquittals suggested "that the jury was able to sift through the evidence in an analytical fashion . . . .").

The proof as a whole was enough to support Savarese's conviction for identity fraud, and the district court therefore did not err in denying his motion for acquittal on that count.

## 3. Evidentiary rulings

When an appropriate objection has been made, we generally review a district court's ruling to admit or exclude trial evidence

for abuse of discretion.  <u>United States</u> v. <u>Nguyen</u>, 542 F.3d 275, 279 (1st Cir. 2008).  Here, Savarese challenges three such rulings, concerning the admission of (1) photocopies of false identifications, (2) cash advance checks, and (3) charts summarizing the particulars of more than 100 fraudulent withdrawals.  We elaborate below.

### i. False identification duplicates

At trial, the government introduced what were purported to be photocopies of seventeen false identifications made for the defendants by Dana Ross Studios, the originals having been destroyed or discarded after use.  To authenticate the proffer, Boston Police Detective Steven Blair testified that during the course of his investigation, more than 300 such photocopies were provided to him directly by Dana Ross owner Donald Berman, or one of Berman's employees, often within minutes of the originals being scanned, printed, and sold.

Savarese suggests, as he did below, that the photocopies were not satisfactorily authenticated.  The proof, he argues, failed to eliminate the possibility that the photocopies were fakes -- a possibility enhanced by the fact that several of the duplicates at issue exhibited a picture of Savarese, who apparently had never physically appeared at the Dana Ross facility.  Nor, according to Savarese, could a finding of authenticity be reliably based on material emanating from Berman, whose own checkered

-15-

criminal past and questionable business practices cast doubt on his motivation for cooperating with law enforcement.

It is a bedrock principle that documentary evidence must be authentic, the test for which is uncomplicated:  where a showing is sufficient to allow a reasonable person to believe that the evidence is what it purports to be, that evidence may be admitted subject to the factfinder's assessment of weight.  Fed. R. Evid. 901(a); United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997).  There is no single required way, moreover, to authenticate evidence.  As this court has previously recognized:

> [T]he direct testimony of a custodian or a percipient witness is not a sine qua non to the authentication of a writing.  Thus, a document's appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, can, in cumulation, even without direct testimony, provide sufficient indicia of reliability to permit a finding that it is authentic.

United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994) (citations and internal quotation marks omitted).

Notwithstanding Savarese's protestations to the contrary, the photocopies were authenticated not only by the detailed testimony of a percipient witness (Detective Blair), but also by cumulative circumstance.  Each of the seventeen duplicates could be tracked through a name, identification number, address, or a combination thereof to the transaction records of one or more fraudulent withdrawals.  The photocopied images were also

-16-

internally consistent, and bore striking stylistic similarities to the six original false identifications possessed by Savarese and DeSimone at the time of their arrest. Indeed, the duplicate and original for victim "G.C." -- the only example for which the government was able to produce both -- were identical. The fact, as Savarese maintains, that he never visited Dana Ross Studios in person does little to support the inference that the photocopies were inauthentic; the identifications could easily have been manufactured with nothing more than a pre-existing photograph, which, according to the testimony of co-conspirator Richard Regnetta, was exactly how Savarese's identifications were made. Thus, given the totality of the circumstances, we agree with the trial court that a reasonable person could believe that the photocopies were what they purported to be.

Savarese's remaining concerns with respect to Berman's reliability are not entirely without merit. It is not inconceivable that the photocopies had been doctored, or constituted an instrument through which Berman, in an attempt to curry favor with local law enforcement, aspired to carry out an elaborate fabrication to reinforce the ongoing investigation. The burden of authentication, however, "does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." Holmquist, 36 F.3d at 168. Rather, the

standard for authentication, and hence for admissibility, is one of reasonable likelihood, <u>id.</u>, and we think that standard has been met. Any lingering questions regarding Berman's trustworthiness go more properly to the weight of the evidence than to its admissibility.

Rulings of this nature often depend on the trial judge's intimate knowledge of the case. Mindful of this, and of the broad deference accorded to a trial court's determinations of authenticity, we cannot say that the court abused its considerable discretion in admitting the photocopies into evidence.

### ii. Cash advance checks

In order to address Savarese's second evidentiary objection, some additional details are necessary concerning the process by which the defendants obtained the cash advances in question. At designated kiosks inside the targeted gambling establishments, each defendant swiped a stolen credit card and entered the desired sum of withdrawal. If the request was approved, the requestor presented the credit card and corresponding false identification to a cashier, who retrieved the transaction and printed a negotiable instrument called a "cash advance check." Certain information was transcribed by the cashier from the identification onto the check (typically the identification number, name, and/or address), which the cashier then initialed, stamped, and filed before issuing the funds. Eventually, the checks were

housed in a centralized repository managed by third-party entity Global Cash Access ("GCA"), a cash access provider for parimutuels including racetracks and casinos.

Over objection, the government submitted approximately forty cash advance checks into evidence and elicited testimony from Robert Standley, GCA's Vice President of Settlements and Security, averring that the checks were kept in the ordinary course of GCA's business activity. Savarese challenges the submission on the grounds that the checks were hearsay, see Fed. R. Evid. 801(c),[5] and that they did not qualify for admission under the business records exception to the hearsay rule, see Fed. R. Evid. 803(6).[6]

---

[5] Federal Rule of Evidence 801(c) defines the term "hearsay" as a "statement that . . . the declarant does not make while testifying at the current trial or hearing . . . and a party offers in evidence to prove the truth of the matter asserted in the statement."

[6] Under the business records exception, the following is not excluded by the rule barring hearsay:

> A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the

-19-

He asserts that only a representative from each individual gambling establishment could testify as a "custodian or other qualified witness" that the records were compiled in the regular course of business and that, therefore, they may be admitted without objection on hearsay grounds.  See id.  In essence, Savarese's challenge poses two questions:  (1) whether the cash advance checks -- or more precisely, the cashier notations -- fall within the traditional definition of hearsay; and (2) if so, whether Standley's testimony was sufficient to admit the checks as GCA business records.

While these questions may be interesting, we need not resolve either of them.  Although Savarese contested the admission of this evidence at trial, he did so on other grounds, and thus our review is for plain error only.[7]  See United States v. Ziskind, 491 F.3d 10, 13-14 (1st Cir. 2007) ("An objection on one ground does not preserve appellate review of a different ground.").  To prevail

---

testimony of the custodian or another qualified witness . . .; and

(E) neither the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

[7] In his motion to exclude the cash advance checks, Savarese argued that "where, as here, the government does not have original signatures on the checks or cash receipts, neither the government nor the defense is able to produce an expert analysis of the handwriting to determine whether the signatures were forged by the defendant as the government alleges."

under this exacting standard, Savarese must demonstrate that (1) an error occurred which was (2) clear or obvious and which not only (3) affected his substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. United States v. Andújar-Basco, 488 F.3d 549, 554 (1st Cir. 2007).

Even assuming that the disputed checks constitute hearsay as defined by Rule 801, and that their admission contravenes any applicable hearsay exceptions, Savarese nonetheless cannot satisfy even the second prong of the plain error standard, which requires that the error be "clear or obvious at the time of appellate consideration." See United States v. Mastera, 435 F.3d 56, 61 (1st Cir. 2006). As he acknowledges in his brief, whether a third party's records (here, those of the parimutuels) can be integrated into the records of the offering entity (here, those of GCA) for purposes of admission under the business records exception is not an issue upon which this circuit has reached a uniform conclusion. Compare F.T.C. v. Direct Marketing Concepts, Inc., 624 F.3d 1, 17 n.15 (1st Cir. 2010) (holding that business records which included data entered by a third party were "so intimately integrated into" the records of the offering party that "they were reliable enough to be admissible"), and United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992) (Breyer, J.) ("The fact that the [hearsay evidence] . . . had earlier been the record of a different business . . . is

-21-

irrelevant.  Because it was relied upon by the [current testifying party], the . . . record was integrated into the records of the [testifying party], along with the additional handwritten notation."), with United States v. Patrick, 248 F.3d 11, 21-22 (1st Cir. 2001) (holding that where a business record contains information from parties who are not themselves part of the business, that information is not admissible as an exception to the hearsay rule), and Belber v. Lipson, 905 F.2d 549, 551-52 (1st Cir. 1990) (finding that the mere custody by a third-party entity of the medical records of a doctor does not incorporate them into the third-party entity's business records), and United States v. Vigneau, 187 F.3d 70, 75-77 (1st Cir. 1999) (declining to follow, but not overruling, Doe).[8]  Thus, to the extent the district court erred, if at all, by admitting the checks pursuant to Standley's testimony, the error was perforce neither clear nor obvious, and Savarese's second evidentiary objection necessarily fails.  See United States v. Marino, 277 F.3d 11, 32 (1st Cir. 2002) (declining to find plain error where the law was unsettled).

---

[8] Although not universally accepted in other circuits, several courts have found that a business record made (in whole or in part) by a third party, but incorporated into the records of another entity, is thereby "made" by the entity, and thus is admissible if the other requirements of Rule 803(6) are satisfied.  See, e.g., United States v. Adefehinti, 510 F.3d 319, 326 (D.C. Cir. 2007); United States v. Petrie, 302 F.3d 1280, 1287-88 (11th Cir. 2002); United States v. Childs, 5 F.3d 1328, 1333 (9th Cir. 1993); Matter of Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir. 1981); United States v. Carranco, 551 F.2d 1197, 1200 (10th Cir. 1977).

### iii. Summary charts

In his final assignment of evidentiary error, Savarese assails the admission of two charts purporting to summarize various aspects of the alleged conspiracy. Because this objection was preserved, we review the trial court's decision to admit the evidence for abuse of discretion. United States v. DeSimone, 488 F.3d 561, 575 (1st Cir. 2007). Within the bounds of that deferential rubric, "[i]t is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful[,]" Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 67 (1st Cir. 2002), and any error in exercising that broad discretion will not result in reversal if the error is harmless, i.e., "if it is highly probable that the error did not influence the verdict," United States v. García-Morales, 382 F.3d 12, 17 (1st Cir. 2004).

At the close of its case-in-chief, the government introduced, through the testimony of federal auditor Steven Zappala,[9] two summary charts pertaining to the fraudulent transactions. The first, exhibit 35A, listed and matched the names from 367 false identifications furnished by Dana Ross Studios with the defendant whose picture appeared on each. Exhibit 35B, in turn, catalogued the details of 107 different cash advances,

---

[9] Zappala described himself as an auditor employed by the United States Attorney's Office for the District of Massachusetts.

-23-

including the date of the transaction, the name on the credit card, the type of credit card used, the name of the establishment where the advance was taken, the number of transactions processed with each card, the total amount of cash advanced, and perhaps most importantly, the name of the defendant whose false identification was associated with each transaction. Zappala explained that to create exhibit 35A, he personally compared the images on all 367 false identifications -- only twenty-three of which were actually admitted at trial -- to the images on the defendants' most recent drivers' licenses. To compose exhibit 35B, Zappala matched unique identifying information from the 107 cash advance checks -- approximately forty of which were entered into evidence -- with the corresponding false identifications, from which he was able to draw a connection to specific defendants.

On appeal, Savarese maintains two grounds for excluding the charts: (1) that they served merely as a conduit for otherwise inadmissible evidence, namely, unauthenticated identifications and hearsay-imbued cash advance checks -- an issue we have already addressed <u>supra</u>, and need not revisit; and (2) that by linking a defendant to each fraudulent transaction, they incorporated Zappala's speculative opinion in violation of Federal Rule of Evidence 1006. <u>See</u> Fed. R. Evid. 1006 (permitting the use of summary charts to prove the content of voluminous writings that cannot be conveniently examined in court); <u>see also</u> <u>United States</u>

-24-

v. <u>Milkiewicz</u>, 470 F.3d 390, 397-98 (1st Cir. 2006) (suggesting that summary charts admitted under Rule 1006 must be neutral and nonprejudicial).[10] The use of summary charts, and the interplay among the rules governing their admission, has proved fertile ground for litigation; yet, we need not re-plow that ground here, because the admission of Zappala's exhibits, even if erroneous, was harmless error. We explain briefly.

Savarese ultimately was convicted on four counts: one count of conspiracy, two counts of aggravated identity theft, and one count of identity fraud. As to the latter three, the information contained in the charts was entirely cumulative; the government had already offered into evidence the false identifications, cash advance checks, photographs, and other documentary evidence related to those charges, thus rendering any erroneous admission harmless. <u>See</u> <u>United States</u> v. <u>Piper</u>, 298 F.3d 47, 58 (1st Cir. 2002) ("Cumulative evidence is typically regarded as harmless."). For the remaining count of conspiracy, the contested charts served only as a fraction of the case against Savarese. The government submitted, inter alia, almost forty cash

_____

[10] Although, as alluded to by the government, there exist multiple evidentiary rules under which a summary chart might be admitted -- <u>see, e.g.</u>, Fed. R. Evid. 611(a) and 703 -- Rule 1006 is probably the only potential foundation in this instance. Zappala was never qualified as an expert, thus negating the use of Rule 703, and much of the evidence undergirding the charts was never admitted, likely precluding any reliance on Rule 611(a). <u>See</u> <u>Milkiewicz</u>, 470 F.3d at 397.

advance checks, twenty-three false identifications, car rental records, personal credit card records, and health club records to establish Savarese's participation in the conspiracy. Buttressing this evidence was the detailed and substantially consistent testimony of two of Savarese's ex-associates regarding the intricacies of his involvement in the fraud scheme. In sum, the government's evidence of Savarese's guilt on the conspiracy charge was overwhelming, and any error related to the admission of Zappala's summary charts on that count was also harmless. See United States v. Rivera-Rodríguez, 617 F.3d 581, 595 (1st Cir. 2010) (finding that the potentially impermissible admission of evidence was harmless in light of the otherwise overwhelming proof of conspiracy). Consequently, Savarese's fifth and final charge of trial error falls short.

## 4. Sentencing challenges

This brings us to the last of Savarese's litany of arguments, that the trial judge misapplied the guidelines during sentencing. After assigning a base offense level (BOL) of 6, the district court added twenty-two levels pursuant to four separate enhancements: fourteen levels for causing a total amount of loss between $400,000 and $1 million, U.S.S.G. § 2B1.1(b)(1)(H); two levels for engaging in an offense that involved between ten and fifty victims, § 2B1.1(b)(2)(A); two levels for relocating the

fraudulent scheme to evade law enforcement, § 2B1.1(b)(10)(A)[11]; and four levels for organizing or leading the criminal enterprise, § 3B1.1(a). The adjusted offense level of 28, coupled with a criminal history category (CHC) of V, yielded a sentencing guidelines range (GSR) of 164 to 199 months. Taking into account the factors delineated in 18 U.S.C. § 3553(a), the court determined that a sentence on the low end of the GSR was appropriate, and imposed a 168-month incarcerative term. On appeal, Savarese asks us to vacate his sentence, renewing his previously unsuccessful objections to the "relocation" and "number of victims" enhancements.

When confronted with claims of sentencing error, we review the district court's interpretation and application of the sentencing guidelines de novo, and assay any subsidiary findings of fact for clear error. United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003). Thus where, as here, a defendant challenges the factual predicate supporting the court's application of a sentencing enhancement, "we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence." United States v. Luciano, 414 F.3d

---

[11] This provision recently has been re-designated from U.S.S.G. § 2B1.1(b)(9)(A) to § 2B1.1(b)(10)(A). While the parties refer to the provision as § 2B1.1(b)(9)(A), we will use the current numbering to avoid the potential for confusion.

174, 180 (1st Cir. 2005) (internal citation omitted). Against this backdrop, we assess Savarese's arguments sequentially.

### i. "Relocation" enhancement

U.S.S.G. § 2B1.1(b)(10)(A) prescribes a two-level increase if the defendant (1) relocated, or participated in relocating, a fraudulent scheme to another jurisdiction, and (2) did so with the intent to evade law enforcement or regulatory officials. Savarese challenges only the first prong of this enhancement, asserting that the present scheme was never actually relocated because its "hub" -- encompassing both Dana Ross Studios and the primary residences of a majority of the conspirators -- was always firmly rooted in greater Boston. The rest of the scheme, he explains, including the cross-jurisdictional sojourns to numerous health clubs and gambling establishments, consisted of nothing more than ephemeral "spokes" of the overarching plan. His argument, though ably presented, lacks force.

Even if we were to adopt the proposed "hub and spokes" approach to evaluating relocation under § 2B1.1(b)(10)(A), see, e.g., United States v. Morris, 153 Fed. App'x 556, 558-59 (11th Cir. 2005), a matter on which we reserve judgment, Savarese's depiction of the hub in this case misses the mark. The theft and fraudulent use of the credit cards seems to us at least as critical, if not more so, to the operation's success than any of its other elements; indeed, these acts comprised the heart of the

enterprise. Their transitory nature does not undermine their centrality to the scheme, and conversely, the fact that other tangential elements recurred in a convenient geographic locale does not necessarily render that location the scheme's effective "hub." More accurately, then, the structure of the fraudulent scheme might be best described not as a hub with spokes, as was the case in Morris, but as two hubs adjoined; Morris is thus inapplicable on its facts. Because at least one of those hubs moved across jurisdictions, and did so with the primary intent to evade law enforcement, the district court did not clearly err when it increased Savarese's offense by two levels under § 2B1.1(b)(10)(A).[12] Contrast Morris, 153 Fed. App'x at 558-59 (reversing the district court's finding of relocation where stolen credits cards were fraudulently used to make purchases across northern Georgia, but all other aspects of the scheme, including

---

[12] To the extent that Savarese contests the second prong of the enhancement, his challenge is unavailing. The evidence supports an inference that the defendants avoided returning to the same health clubs and gambling establishments not because of any shortage of available credit cards and funds, but because the likelihood of detection would otherwise have increased substantially. Thus, any claim that relocation was purely a "method of operation" is unconvincing. See, e.g., United States v. Hessa, 446 Fed. App'x 473, 475 (6th Cir. 2012) (rejecting the appellant's argument that he was making fraudulent returns at department stores in different jurisdictions as a "method of operation" rather than to avoid detection); United States v. Braxton, 374 Fed. App'x 248, 250 (3d Cir. 2010) (finding that where the appellant fraudulently purchased gift cards in six states, the only reasonable inference to be drawn from the relocation was an intent to avoid detection).

the theft of licenses and credit cards, occurred in the general

Atlanta area).

ii. "Number of victims" enhancement

The sentencing judge likewise did not clearly err in

determining that a two-level adjustment was warranted, under

U.S.S.G. § 2B1.1(b)(2)(A), for an offense impacting at least ten

victims -- specifically, the card-issuing financial institutions

that were swindled by the fraudulent transactions.[13]

In order to apply such an enhancement, the district court

must find, by a preponderance of the evidence, that ten or more

victims suffered an actual loss. United States v. Sharapka, 526

F.3d 58, 61 (1st Cir. 2008). Here, the relevant evidence

established the following: that the appellants, along with their

co-conspirators, executed fraudulent transactions with 107 credit

cards, all of which resulted in actual loss to the financial

institutions that issued the cards; that, of those 107 cards, most

---

[13] A "victim," as relevant here, means "any person who sustained any part of the actual loss determined under [§ 2B1.1(b)(1)]," and "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1, cmt. n. 1, n. 3(A)(i). The government does not propose -- and we have yet to decide in this circuit -- whether the individual cardholders might also constitute "victims" under the language of § 2B1.1 where, as here, the unauthorized charges are reversed before they are required to make any payments. See United States v. Stepanian, 570 F.3d 51, 56 n.5 (1st Cir. 2009) (declining to decide the issue). Because the parties have not raised or briefed the issue, we leave it for another day, and assume that the class of putative victims in this case is comprised only of the financial institutions that issued the stolen cards and paid the unauthorized charges.

of which were destroyed after use, only twenty-three were able to be traced to their issuers; that those twenty-three cards were issued by five different institutions; and that a sixth issuer (American Express, which issues cards directly and through banks) also suffered incidental pecuniary harm at the hands of the appellants.

Drawing from that evidence, and accounting for the vast number of credit card issuers nationally, the district court deemed it more likely than not that, among the remaining eighty-four untraceable cards, there were at least four additional issuing institutions. Savarese frames this finding as an impermissible inferential leap; we think it a reasonable extrapolation supported by a preponderance of the evidence. Ideally, of course, the sentencing court would have at its disposal a list that concretely identifies every individual victim for whom there was an actual, attributable loss. But under the present circumstances, where the government's inability to fully populate such a list stems largely from the defendant's contemporaneous acts of concealment, it was not clear error for the court to reasonably deduce the number of victims from reliable evidence.[14]

_____

[14] To cinch matters, at sentencing Savarese mentioned that a small number of credit card issuers dominate the market. On appeal, he fleshes the argument out by offering a chart purporting to show that ten issuers control 88 per cent of the market, five of which account for an 80 per cent share. Before the sentencing judge, five issuers were represented among the 23 accounts for which the issuers could be identified. Of these, only four are on

## B. James DeSimone

We turn, finally, to the claims of appellant James DeSimone. For his role in the credit card scheme, DeSimone pled guilty to conspiracy, access device fraud, and several counts of aggravated identity theft. He appeals only his sentence, arguing -- as did Savarese -- that the district court erroneously imposed two unwarranted guideline enhancements.

The district court set the defendant's BOL at 6, granted a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1, and made a series of upward adjustments almost identical to those applied to Savarese: fourteen levels for causing an amount of loss between $400,000 and $1 million, § 2B1.1(b)(1)(H); two levels for the number of victims, § 2B1.1(b)(2)(A)(i); two levels for relocating the fraudulent scheme, § 2B1.1(b)(10)(A); and two levels pursuant to § 3B1.1(c) for managing or supervising the criminal enterprise. These and other findings yielded a GSR of 81 to 95 months, and the court, again opting for the low end of the range, settled on a term of 81 months' imprisonment.

---

the appellant's proffered list of dominant issuers. One is not, and there was reliable direct evidence of a sixth issuer, American Express, a victim not represented by any of the 107 credit cards associated with the cash advances. According to Savarese's proffer, two other dominant issuers not represented among the 23 accounts hold a 32 per cent share of the market. With these eight issuers taken into consideration, the sentencing judge did not clearly err in concluding, based upon the available information, that at least two more credit card issuers were harmed by the scheme.

DeSimone now advances two principal claims of error. First, he posits that the sentencing court attributed to him an excessive amount of pecuniary loss, maintaining that the sum total of cash advances taken after he joined the conspiracy was less than $400,000. Second, he insists that the government overstated his role in the conspiracy, and that he never exerted sufficient control over any of his cohorts to justify a managerial enhancement. We review these fact-bound determinations for clear error, which requires that we uphold the sentence absent a definite and firm conviction, based on the entirety of the evidence, that a mistake has been made. United States v. Rivera Calderón, 578 F.3d 78, 99-100 (1st Cir. 2009).

## 1. "Amount of loss" enhancement

We begin with DeSimone's argument that a substantial portion of the $430,000 in losses was accumulated prior to his joining the illegal scheme, and therefore should not be considered in assigning the proper enhancement under U.S.S.G. § 2B1.1(b)(1).

Generally, in identifying relevant conduct under the sentencing guidelines, a defendant engaging in jointly undertaken criminal activity is accountable for all reasonably foreseeable acts performed in furtherance of that activity. U.S.S.G. § 1B1.3. Such liability ordinarily extends only to harm that occurs after a defendant actually joins the conspiracy; with respect to sentencing, a late-joining conspirator is not usually responsible

for pecuniary loss incurred prior to his joinder, absent some post-hoc act of facilitation or concealment.  See United States v. Rodríguez-González, 433 F.3d 165, 168 (1st Cir. 2005); U.S.S.G. § 1B1.3, cmt. n.2 ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct . . . .").  DeSimone argues that discerning the date that he entered the conspiracy, and thereby appraising the amount of reasonably foreseeable loss for which he is responsible, is especially important because the contested loss amounts could mean the difference between a fourteen-level increase (if the loss is valuated above $400,000) and a twelve-level increase (if the valuation is below $400,000).  See U.S.S.G. § 2B1.1(b)(G)-(H).

At sentencing, there was competing evidence supporting different possible dates when DeSimone joined the conspiracy. DeSimone, corroborated by trial testimony from his co-conspirator (and brother) Donald Jr., avowed that he did not participate in the fraud scheme until at least April 1, 2006, after which the cumulative amount of cash advances was less than $400,000.  Other evidence, including false identifications and cash advance checks, indicated that he was actively involved in the conspiracy at least as early as January 2006, which would place the attributable-loss

figure well above the $400,000 threshold.[15]  Although the evidence

easily supports a determination that DeSimone participated by

January at the latest, the sentencing judge did not make an express

finding as to the precise time that he joined the conspiracy.

Instead, in the court's pronouncement of sentence, it found that:

> [w]ith respect to . . . the loss figure, I
> agree with the probation officer, is a
> conservative one and fairly, under the law of
> conspiracy, despite some disagreement about
> exactly when Mr. DeSimone entered the
> conspiracy, nonetheless, the full amount of
> the loss, I believe, is fairly attributable to
> him as a very active member of the conspiracy,
> whatever the exact dates of entry and exit may
> have been.

DeSimone asserts that attributing the entire loss amount,

based solely on his perceived level of activity within the criminal

enterprise, and ignoring when he joined the conspiracy, is an

error of law under our precedent.  See Rodríguez-González, 433 F.3d

at 168.  If, as DeSimone claims, he did not join the conspiracy

until April 1, 2006, the total loss would amount to less than

$400,000, and the resulting upward adjustment would be only twelve

levels, rather than fourteen.  See U.S.S.G. § 2B1.1(b)(1).

If the judge's comments reflected an understanding that

the defendant was accountable for losses attributable to the

---

[15] According to government exhibit 35B, the amount of loss that was attributable to cash advance transactions incurred after January 1, 2006 was approximately $412,000, whereas the amount of loss attributable to cash advances occurring after April 1, 2006 was only $367,000.

conspiracy prior to his joining it, that understanding was erroneous. The government counters that, by attributing over $400,000 in losses to DeSimone, the court implicitly found that he must have joined the conspiracy at least by January 2006. There is more than one way to read the district court's statement relating to the losses for which DeSimone was responsible. As it happens, we needn't firmly resolve this dispute, because the government offers a persuasive alternative argument.

We have previously held that where a district court's impetus for applying a sentence enhancement constitutes an error of law, we may still uphold the enhancement if the court also offered an alternative explanation for which there is sufficient evidentiary support. See United States v. Pizarro-Berríos, 448 F.3d 1, 7-8 (1st Cir. 2006). Here, the district court found, and the government reiterates on appeal, that the full loss figure -- approximately $430,000 -- is a "conservative" one, given the many undocumented charges incurred with stolen American Express cards and other stolen credit cards for flights, meals, hotels, and other incidental costs associated with the scheme. That assessment was explicitly offered by the probation officer in the presentence report and expressly adopted by the sentencing judge, who had presided over Savarese's trial and had heard the evidence himself. The court supportably found that DeSimone was "a very active" participant in the conspiracy. Because DeSimone is clearly

accountable for cash advance losses of no less than $367,000, see note 15 supra, the court's determination that the two-level enhancement applies is adequately supported by the record, so long as more than $33,000 in incidental travel charges were incurred from April 2006 until the enterprise was shut down seventeen months later.  Nearly 100 cash advance transactions took place during that time in far-flung venues across the United States, associated with numerous multi-day trips.  An estimate of additional credit card use for flight, hotel, meal and other incidental charges in the modest amount required to exceed the $400,000 threshold was sufficiently supported by the testimony and other evidence, and the defendant offered no evidence in opposition.  There was thus no clear error in the loss amount finding.  See U.S.S.G. § 2B1.1, cmt. n. 3 ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence."); Sharapka, 526 F.3d at 61 (explaining that "deference is owed to a sentencing judge's determination of the loss," in part because "[t]he court need only make a reasonable estimate of the loss").

## 2. "Managerial role" enhancement

In his second and final point on appeal, DeSimone contends, as he did in objections to the PSR and at sentencing, that he never maintained supervisory authority over any of his fellow conspirators.  After thoroughly reviewing the record, we

conclude that the district court did not clearly err in determining otherwise.

Under U.S.S.G. § 3B1.1(c), a defendant's BOL may be augmented by two levels if the underlying criminal activity involved at least two, but fewer than five complicit individuals (including the defendant), and the defendant, "in committing the offense, . . . exercised control over, managed, organized, or superintended the activities of at least one other participant." United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010). In ascertaining whether a defendant played a supervisory role in the offense, courts are encouraged to consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4. Although, as the district court acknowledged, DeSimone was by no means the mastermind of the operation, that is not the standard by which "managerial" status is governed. A defendant's exhibitions of authority need be neither supreme nor continuous; we have even held that, in some circumstances, the government need only show by a preponderance of the evidence "that the defendant exercised authority or control over another participant on one occasion." United States v.

-38-

García-Morales, 382 F.3d 12, 20 (1st Cir. 2004). The evidence is sufficient to support a managerial enhancement here.

To begin, the evidence clearly establishes that DeSimone was primarily responsible for recruiting co-defendant Richard Regnetta into the conspiracy. This conduct, by itself, constitutes a "managerial" function under § 3B1.1. United States v. Joyce, 70 F.3d 679, 683 (1st Cir. 1995). DeSimone's contention that Regnetta practically begged for his permission to participate, and therefore that he did not actively "recruit" Regnetta in the ordinary sense, is of no moment; in gauging the applicability of § 3B1.1, recruitment is not about the intensity or direction of pursuit, but the demonstration of individual authority necessary to bring a new member into the fold. See, e.g., United States v. Rivera, 429 Fed. App'x 938, 942 (11th Cir. 2011) (upholding application of § 3B1.1 in part because the appellant "took on a [co-conspirator] as a recruit when the [co-conspirator] asked to join the operation."). Whether Regnetta initiated the recruitment or vice versa, it was ultimately DeSimone who authorized Regnetta's participation in the scheme, and it is that manifestation of authority which infers a position of leadership within the organization. See U.S.S.G. § 3B1.1, cmt. n. 4.

There is also ample evidence that DeSimone (1) controlled the flow of information to his Boston-based associates, (2) instructed Regnetta, on at least one occasion, exactly what to

do when they arrived at an Arkansas racetrack, and (3) dictated the distribution of false identifications to the other members of the conspiracy. In response to these allegations, DeSimone claims that he was merely transmitting orders from Savarese. He had no real discretion, he argues, and was nothing more than an instructive intermediary. Supervision in the context of § 3B1.1, however, "often consists of transmitting directives from above. Low-level supervisors are themselves closely supervised and thus have little discretion." United States v. Figueroa, 2012 WL 2086610, at *4 (7th Cir. 2012); see also United States v. Goldberg, 105 F.3d 770, 777 (1st Cir. 1997) ("[A] defendant need not be at the top of a criminal scheme to be a manager or supervisor."). Accordingly, the fact that DeSimone acted as a relay for much of the information does not preclude the application of § 3B1.1.

We do not discount the presence of certain countervailing facts -- to wit, that Savarese, and not DeSimone, was the true kingpin of the conspiracy; that DeSimone did not collect a disproportionate share of the proceeds; and that two of the co-conspirators were members of DeSimone's family (and, thus, less likely to consider themselves subservient). Yet, even in light of these facts, the record in its entirety more than adequately supports the inference that DeSimone, by the sum of his activities, exercised a sufficient level of authority within the conspiracy. As a consequence, we can find no basis for assigning error, clear

-40-

or otherwise, to the district court's application of a two-level aggravating role adjustment in this case.[16]

### III. Conclusion

For the foregoing reasons, Savarese's conviction, and Savarese's and DeSimone's sentences, are **affirmed**.

---

[16] In fact, DeSimone was fortunate to receive only a two-level enhancement. As a manager or supervisor in an enterprise comprising five or more participants, he could have received the three-level enhancement in § 3B1.1(b). See United States v. Cruz-Rodríquez, 541 F.3d 19, 33 (1st Cir. 2008) ("A[] [three-level] upward adjustment is available under [§] 3B1.1(b) if (1) the criminal scheme involved five or more participants (including the defendant) or was otherwise extensive and (2) the defendant was responsible for managing or supervising the activities of at least one of these participants.").