FLAUM, Circuit Judge,
dissenting.
It is my view that Verita Hines-Flagg relocated her fraud scheme to another jurisdiction for the purpose of evading law enforcement and structured her entire scheme in such a way as to do precisely that. Accordingly, I respectfully dissent.
Though the Brown Deer police did not know it when they arrested Hines-Flagg and her nephew, the two had driven from Detroit to Milwaukee to effectuate a *758 scheme that they had previously carried out in various venues throughout Illinois, Ohio, and Wisconsin. The scheme worked as follows: the duo used fake identification to open lines of credit at various retail stores in the names of real people to fraudulently purchase merchandise in large quantities. They carried out the scheme in each town that they hit, before moving on to avoid detection by law enforcement. It is my judgment, therefore, that the district court’s application of U.S.S.G. § 2Bl.l(b)(10)(A) — permissible when a “defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials” — was appropriate.
The majority grounds its position in the fact that Hines-Flagg planned her scheme at her home in Detroit and returned there after each out-of-town trip to sell her fraudulently-obtained goods. In the majority’s words, the “scheme was always meant to operate in multiple locations, with Detroit as its home base. In other words, it was always located in multiple jurisdictions.” I view Hines-Flagg’s criminal operation differently. Hines-Flagg, of course, had a tie to Detroit (that’s where she lived), but the heart of the scheme— indeed, the fraud itself — traveled from place to place. Therefore, I agree with the majority’s statement that the scheme was always meant to operate in multiple locations; it was, by design, a scheme that moved around. But I disagree that it was always located in multiple jurisdictions; the suggestion is that the scheme somehow was operating in more than one jurisdiction simultaneously. I cannot adopt such a characterization of the defendant’s conduct. I see the scheme as being relocated with Hines-Flagg to each jurisdiction in which she performed it.
The district court found that Hines-Flagg and her nephew consciously chose not to perform the scheme in the state of Michigan; rather, they only victimized stores in Ohio, Illinois, and Wisconsin. And prior to leaving home for these out-of-state “shopping” trips, the pair packed all the materials they needed to conduct their scheme: a disguise kit (including wigs), the personal identity information for their victims (SSN, DOB, and address), counterfeit Michigan driver’s licenses, a list of where the victims had accounts so they would know what stores to hit, a credit card reader, and materials for making ID cards. They fraudulently leased cars— like the Lincoln, leased in Illinois, that they drove on the day of their arrest in Brown Deer — to use on their trips. And they made sure not to conduct their scheme in the same location more than twice. Thus, it is evident to me that Hines-Flagg relocated her fraud scheme from jurisdiction to jurisdiction for the purpose of evading law enforcement.[1]
*759 In reaching its conclusion, the majority relies on an unpublished, per curiam decision from the Eleventh Circuit, United States v. Morris, 153 Fed.Appx. 556 (11th Cir.2005) (reversing an application of the relocation enhancement), and distinguishes the facts here from those in the First Circuit’s decision in United States v. Savarese, 686 F.3d 1 (1st Cir.2012) (affirming the relocation enhancement’s application). Although the facts of this case arguably are more analogous to those at issue in Morris, I find the logic employed in Sa-varese to be more persuasive (though I emphasize that neither decision devotes significant attention to the relocation enhancement issue).
In Morris, the defendant ran a scheme in which he stole credit cards and driver’s licenses from lockers at various Atlanta-area health clubs, then used them to buy electronic equipment at retail stores. 153 FedAppx. at 557. After fraudulently obtaining the goods, Morris’s co-defendant would then sell them on eBay from his home in Marietta, Georgia. Id. Almost all of the stores victimized by Morris were in the Northern District of Georgia, with the exception of a few in Albany — a city in Georgia’s Middle District. Id. at 558. (Although a different co-defendant visited the Carolinas, Texas, Alabama, Mississippi, Ohio, and Arkansas as part of the conspiracy, it’s unclear as to whether that co-defendant committed credit card fraud in those locations. Id.)
The Eleventh Circuit reversed the district court’s application of the relocation enhancement, agreeing with Morris that “his conduct could not be described as ‘relocating’: at best, his conduct showed that he operated in multiple locations but always sold the merchandise to [his co-defendant], who remained in the same location.” Id. at 558. In doing so, the court noted that “the government presented no evidence that [Morris] or any member of the conspiracy tried to ‘relocate’ the scheme to another jurisdiction, under the ordinary meaning of that word.” Id.
I am unpersuaded by the majority’s extension of Morris to the facts of our case, as the facts of Morris differ in a critical respect. There, the fraudulent conduct occurred largely within one federal jurisdiction, the Northern District of Georgia — the same jurisdiction in which Morris lived and where his home'base was situated. Morris did make purchases in one town located in the Middle District of Georgia, but there is no suggestion that he crossed federal-jurisdictional lines for the purpose of evading law enforcement. Here, by contrast, Hines-Flagg intentionally victimized stores in different federal jurisdictions, spanning several different states — all to minimize the odds of being caught.
In any event, I find the First Circuit’s logic in Savarese to be more convincing. Savarese, like Morris, involved credit cards stolen from gym locker rooms. 686 F.3d at'5. After obtaining the cards, Sa-varese would fax a list of the cardholders’ names, as well as forged replica signatures, to his associates in Boston, who would make false identification for Sa-varese and others using the information. Id. Armed with the false documents, Sa-varese and his cohorts then traveled to over a dozen states throughout the country to withdraw large cash advances in their victims’ names. Id. at 5-6. On appeal, Savarese challenged the district court’s imposition of the two-level relocation enhancement, urging the court to adopt the “hub and spokes” approach (as the court described it) of Morris. Id. at 15. The court, however, upheld the application of the enhancement (while purporting to reserve judgment as to the validity of the Eleventh Circuit’s logic, deeming that theory factually inapplicable). Id. at 15.
Though Savarese stole the credit cards and communicated with his cohorts at the *760 scheme’s home base in Boston, the court reasoned: “The theft and fraudulent use of the credit cards seems to us at least as critical, if not more so, to the operation’s success than any of its other elements; indeed, these acts comprised the heart of the enterprise. Their transitory nature does not undermine their centrality to the scheme, and conversely, the fact that other tangential elements recurred in a convenient geographic locale does not necessarily render that location the scheme’s effective ‘hub.’ ” Id. at 15. The court went on: “More accurately, then, the structure of the fraudulent scheme might be best described not as a hub with spokes, as was the case in Morris, but as two hubs ad-joined_” Id. at 15. “Because at least one of those hubs moved across jurisdictions, and did so with the primary intent to evade law enforcement,” the First Circuit upheld the enhancement’s application. Id. at 15-16. I would apply that same reasoning here.
Hines-Flagg contends that, in enacting the relocation enhancement, the Sentencing Commission sought to increase sentences for telemarketing schemes, which often relocate to evade ongoing law enforcement investigations. Therefore, she argues, it should not apply to her since she never relocated her scheme while being actively pursued by the authorities. I reject that logic. First, the most successful fraudsters are those that structure their schemes in ways as to avoid detection, so it seems unlikely that the Sentencing Commission would exempt those particularly sophisticated defendants from the enhancement at issue here. Second, telemarketing schemes were just one of many fraud schemes that the Sentencing Commission sought to curb in enacting the enhancement. See United States v. Singh, 291 F.3d 756, 761 (11th Cir.2002) (discussing the enhancement’s broader purpose). The background notes to U.S.S.G. § 2Bl.l(b)(10)(A) expressly state that the guideline “covers offenses involving theft, stolen property, property damage or destruction, fraud, forgery, and counterfeiting....” And it emphasizes that “most fraud statutes cover a broad range of conduct with extreme variation in severity.”
Moreover, the plain text of the enhancement — again, applicable when a “defendant relocated ... a fraudulent scheme to another jurisdiction to evade law enforcement” — appears to squarely implicate the conduct at issue here. While the enhancement assuredly covers uprooted telemarketing schemes, I read it to also include the conduct of Hines-Flagg, who opened fraudulent lines of credit to steal goods and then intentionally performed that same scheme in other jurisdictions to avoid being caught by law enforcement. Even if it fairly can be said that the home base of Hines-Flagg’s scheme was in Detroit, the critical part of the scheme was the fraud itself. And it was that part that she relocated to different jurisdictions to evade authorities.
Accordingly, I would affirm the district court’s application of U.S.S.G. § 2Bl.l(b)(10)(A) in this case.

. Perhaps the clearest indicator that their scheme was designed to evade law enforcement is the difficulty that law enforcement had — on account of the scheme’s relocating quality — in tying Hines-FIagg's frauds to the same individual. Hines-Flagg initially was charged in Milwaukee County Circuit Court with misappropriating identification information. Following the completion of a three-month sentence, she was extradited to Cook County, Illinois, on identity theft charges related to the leased vehicle. She remained in custody there until November 27, 2013, when she was brought to the Eastern District of Wisconsin for ah initial appearance on the criminal complaint in this case. As the government describes it, a year after her arrest by the Brown Deer police, "after local and state authorities and federal authorities worked together extensively ... they discovered that when Hines-Flagg was arrested on October 4, 2012 [in the Kohl’s parking lot], she was in the throes of committing a preplanned and well thought-out fraudulent scheme similar to others that she had done many times in the past.” The Illinois case then was dropped, and a federal indictment followed.